[No. 13085-8-II. Division Two. February 5, 1992.]

MAINS FARM HOMEOWNERS ASSOCIATION, ET AL, *Respondents*, v. SALIMA WORTHINGTON, ET AL, *Appellants*.

*Alan E. Millet* and *Millet & Mauhar, P.S.; Joseph Lavin* and *Taylor & Taylor,* for appellants.

*Kenneth Williams* and *Johnson & Williams,* for respondents.

ALEXANDER, J. — Salima Worthington and Raymond E. Miller appeal an order of the Clallam County Superior Court. The order denied their motion for summary judgment and granted summary judgment to Mains Farm Homeowners Association for an injunction preventing Worthington from operating an adult family home in the Mains Farm subdivision in Sequim. Worthington and Miller contend on appeal that the Superior Court wrongly concluded that: (1) the operation of an adult family home violated restrictive covenants limiting the use of the lots in the subdivision to "single family residential purposes only"; and (2) the restrictive covenants did not violate public policy. We affirm.

In December 1986, Salima Worthington obtained a license from the Department of Social and Health Services to run what is referred to as an "adult family home". Former WAC 388-76-030(2). Worthington's license permitted her to provide full family care for up to four unrelated, elderly adults. Worthington ran the family home in a residence she rented in the Sol Mar area of Clallam County.

In December 1987, Worthington purchased a home in the Mains Farm subdivision near Sequim. Worthington was aware at the time she purchased the home that there were restrictive covenants governing the subdivision. The pertinent restrictive covenant reads as follows:

> All lots or tracts permitted in Mains Farm shall be designated as "Residence Lots," and *shall be used for single family residential purposes only.*

(Italics ours.)

Worthington admits that at the time that she made the purchase she intended to operate an adult home facility in the residence. The Mains Farm Homeowners Association eventually became aware of the intended use and, in January 1988, the president of the Association sent a letter to Worthington stating that the Association's board of directors had decided that the proposed use of the residence violated the Mains Farm restrictive covenants. Nevertheless, Worthington continued with her plans to operate an adult family home facility.

After completing some remodeling of her home to accommodate four unrelated, elderly adults in need of "full family care",[1] Worthington, together with her two daughters and four unrelated adults, moved into the home. Worthington generally provided the care to the elderly residents herself, but when unable to so, she employed other persons to provide the 24-hour services in her stead. Worthington received compensation from the elderly residents in amounts ranging between $500 and $1,000 per month per person, depending on the degree of care required.

After making several additional requests that Worthington discontinue using her home for an "adult foster care commercial enterprise", the Mains Farm Homeowners Association filed a complaint in the Clallam County Superior Court, alleging that Worthington's use of her home violated the restrictive covenants. It sought to enjoin Worthington from running the adult foster care facility in her home. The Association and Worthington filed cross motions for summary judgment. The Superior Court granted the Association's motion and denied Worthington's. It concluded that Worthington's use of her home violated the restrictive covenants because the use was not "residential only", the "commercial elements" of the adult family home operation overriding the residential aspects of the use.

---

[1] Full family care is defined as 24-hour protective supervision and care for an adult in need of personal and special care. Laws of 1989, ch. 427, § 14.

■ Initially, we observe that the issues in this case were ripe for summary judgment, the parties conceding that there are no material factual disputes about the nature of the activities carried on in Worthington's residence. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). On review of a summary judgment, this court reviews all questions of law de novo. *Hoffer v. State*, 110 Wn.2d 415, 755 P.2d 781 (1988), *aff'd*, 113 Wn.2d 148 (1989).

## MEANING OF THE RESTRICTIVE COVENANT

■ ■ In order to determine if the trial court erred in ruling, as a matter of law, that Worthington's use of her home was not residential, we must look to the language of the restrictive covenant in question. We do this because, although courts should not give a covenant a broader than intended application, "it is well settled that a covenant should not be read in such a way that defeats the plain and obvious meaning of the restriction." *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 180, 810 P.2d 27 (1991). The meaning of words in a restrictive covenant is a question of law for the court. *Krein v. Smith*, 60 Wn. App. 809, 811, 807 P.2d 906, *review denied*, 117 Wn.2d 1002 (1991).

> In construing the meaning of a covenant, clear and unambiguous language will be given its manifest meaning; restrictions in derogation of the free use of land will not be extended to include any use not clearly expressed; doubts will be resolved in favor of the free use of land; and the instrument containing the restriction will be considered in its entirety with any attendant circumstances taken into consideration when the meaning is doubtful.

*Hagemann v. Worth*, 56 Wn. App. 85, 90, 782 P.2d 1072 (1989). The words in the covenant should be given their " 'ordinary and common use'." *Krein v. Smith*, *supra* at 811.

As noted above, the Superior Court reasoned that Worthington's use of her residence was not for "single family residential purposes only" because of what it con-

cluded were "commercial element[s]" of the adult family home operation. Worthington argues to us, as she did at the trial court, that the use of her home as an adult family home was not violative of the restrictive covenants, because the use was for "single family residential purposes only", and not for a commercial enterprise. We disagree.

■ ■ In a strikingly similar case, Division Three of this court, after noting that the terms "business" and "residential" are antonyms, held that the providing of a residence for elderly paying customers is a business use and not a residential use. *Hagemann v. Worth*, 56 Wn. App. at 91. In *Hagemann*, the covenant restricted building to " 'single-family residences' " and prohibited " 'business, industry or commercial enterprise of any kind or nature . . .'." *Hagemann*, 56 Wn. App. at 87. The word "business" has been said to be "a very comprehensive term, . . . embrac[ing] everything about which a person can be employed. . . . [t]hat which occupies the time, attention, and labor of men for the purpose of livelihood or profit." *International Shoe Co. v. State*, 22 Wn.2d 146, 169, 154 P.2d 801, *aff'd*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154, 161 A.L.R. 1057 (1945); *State ex rel. Columbia Broadcasting Co. v. Superior Court*, 1 Wn.2d 379, 383, 96 P.2d 248 (1939), *rev'd on other grounds*, 310 U.S. 613, 84 L. Ed. 1389, 60 S. Ct. 1085 (1940). In *Hagemann*, the court observed that the word "business", in its ordinary and common use, is defined as "human efforts which have for their end living or reward." *Hagemann*, 56 Wn. App. at 90 (quoting *Burton v. Douglas Cy.*, 65 Wn.2d 619, 623, 399 P.2d 68 (1965) (quoting *Easterbrook v. Hebrew Ladies Orphan Soc'y*, 85 Conn. 289, 299, 82 A. 561 (1912))). We reach the same conclusion about the activity here as did the court in *Hagemann*. The use Worthington intended to make of her home was essentially a business use. It was inconsistent with a residential purpose.

In support of her position, Worthington cites *Hunter Tract Imp. Co. v. Corporation of Catholic Bishop,* 98 Wash. 112, 167 P. 100 (1917), a case in which the court was faced with a claim that the use of a residence as a convent for the

Ursuline Catholic Sisterhood violated a covenant restricting the use of any lots described in the deed to "residence purposes only". The court concluded there that the use of the home as a convent was a residential purpose because the restriction of use for " 'residence purposes' referred to the mode of occupancy, and so long as the building was used as a place of abode and no business [was] carried on there, it would be used for residence purposes only." *Hunter*, 98 Wash. at 117.

We do not find the opinion in *Hunter* to be inconsistent with *Hagemann*. In *Hunter*, the court determined that simply because occupants of a house were members of a particular group and were holding religious services did not convert an essentially residential use to a business or commercial use. It held that the use that the Order made of their home was mainly residential and that any other use was incidental to that residential purpose. *Hunter*, 98 Wash. at 115. The court did acknowledge, however, that if the home had been used for the training of women who were seeking admission to the convent, the home might lose its residential character. *Hunter*, 98 Wash. at 115.

The use that Worthington made of her home is unlike that which the court reviewed in *Hunter*. It is more akin to the use in *Hagemann*. Worthington's use of her home for a commercial purpose was not incidental to the residential purpose. Rather, the residential purpose was incidental to the business purpose. The uncontroverted facts are that Worthington provides 24-hour care to four elderly residents for fees of $500 to $1,000 per person per month. In addition, she occasionally hires outside help to assist her in this enterprise. Although a purpose of this enterprise was to provide a residence for elderly persons, a substantial entrepreneurial purpose was at the core of her efforts.

Worthington asserts, additionally, that she is merely a "servant" to the resident, nonowners of her home. She points out that the Mains Farm covenants allow the provision of "quarters for servants for the single family in ownership". Worthington's position is without any merit. The

elderly paying residents are not owners of the residence. Furthermore, Worthington is not a servant of the paying residents. The ordinary meaning of "servant" is "[o]ne employed to perform service in master's affairs, whose physical conduct in performance of the service is controlled or is subject to right to control by the master." Black's Law Dictionary 1533 (4th ed. 1968). Worthington, as the owner of the residence and as a licensed operator of an adult family home, is not subject to control by the other residents and cannot, under any stretch of the imagination, be viewed as a servant "for the single family in ownership".

### PUBLIC POLICY

Worthington also argues that even if the use violated the Mains Farm restrictive covenants, the covenants should not be enforced by injunction because they violate public policy. She points out that the Legislature fairly recently adopted legislation acknowledging the need for services and care of the functionally disabled, seeking to ensure that options such as "community residential facilities" will be developed. Laws of 1989, ch. 427, §§ 1, 2(4) (effective May 14, 1989). As part of that enactment, the Legislature found "that adult family homes are an important part of the state's long-term care system" and "provide an alternative to institutional care and promote a high degree of independent living for residents." Laws of 1989, ch. 427, § 14.

Worthington suggests that these enactments demonstrate a recognition by the Legislature that maintaining disabled persons outside of institutions is of greater value to the public than is the right to restrict the use of land. Worthington contends that the Legislature has clearly resolved the issue in her favor by adopting the following provision relating to zoning:

> An adult family home shall be considered a residential use of property for zoning purposes. Adult family homes shall be a permitted use in all areas zoned for residential or commercial purposes, including areas zoned for single family dwellings.

Laws of 1989, 1st Ex. Sess., ch. 9, § 815(2).

██ In determining whether or not to issue an injunction, the trial court may consider, if appropriate, the interest of the public. *Tyler Pipe Indus., Inc v. Department of Rev.*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982); *Hagemann*, 56 Wn. App. at 92. Generally, public policy favors the free use of one's own land. *White v. Wilhelm*, 34 Wn. App. 763, 772, 665 P.2d 407, *review denied*, 100 Wn.2d 1025 (1983) (quoting *Gwinn v. Cleaver*, 56 Wn.2d 612, 615, 354 P.2d 913 (1960)). A contractual provision such as a restrictive covenant may, however, violate public policy when " '. . . the contract as made has a "tendency to evil," to be against the public good, or to be injurious to the public.' " *Thayer v. Thompson*, 36 Wn. App. 794, 796, 677 P.2d 787 (1984) (quoting *Golberg v. Sanglier*, 27 Wn. App. 179, 191, 616 P.2d 1239 (1980), *rev'd on other grounds*, 96 Wn.2d 874, 639 P.2d 1347 (1982)); *see also* RCW 49.60.224 (provisions in written instruments relating to real property which purport to forbid or restrict the conveyance, encumbrance, occupancy, or lease to persons of a specific race, creed, color, national origin or with any handicap are void and unfair practices).

██ Nevertheless, courts also recognize the necessity of enforcing restrictive covenants to protect property owners from increased pressures of urbanization. *Witrak*, 61 Wn. App. at 179. The modern view is that building restrictions are for the protection of the public as well as the property owner and that such restrictions, in order to be valid, need only be reasonable and reasonably exercised. *Thayer v. Thompson*, 36 Wn. App. at 797.

██ In *Hagemann*, the court determined that, although the development of foster homes is a laudable public policy, covenants prohibiting business or commercial enterprises in an area restricted to single family residences "does not impede furtherance of the public's interest in developing alternative residential care for the elderly", and such policy does not override a contractual prohibition against the location of such facilities. *Hagemann*, 56 Wn. App. at 92. We agree with that view.

The only public policy issue left unanswered in *Hagemann*[2] was "whether zoning may override the constitutional contractual right of parties to covenant". *Hagemann*, 56 Wn. App. at 92. Worthington argues that the zoning legislation referred to above is a clear indication that public policy favors "adult family homes" over restrictive covenants barring them. Her argument ignores the fact that the enactment only relates to the zoning of land. Zoning is a public restriction on the use of land, whereas restrictive covenants are private restrictions. *Thayer v. Thompson, supra.* Although generally a restrictive covenant is not grounds for denial of a zoning variance, the private covenant may provide grounds for a separate action to enjoin the usage of land in violation of the restrictions. *Martel v. Vancouver*, 35 Wn. App. 250, 257, 666 P.2d 916 (1983).

■ ■ Where statutory language is plain, it is not open to construction or interpretation. *Crown Cascade, Inc. v. O'Neal*, 100 Wn.2d 256, 262, 668 P.2d 585 (1983). In our judgment, the Legislature only restricted the public's right to zone adult family homes out of residential areas. The enactment did not, either explicitly or implicitly, restrict the right of private homeowners to adopt covenants which forbid certain uses of land in residential areas.

Affirmed.

PETRICH, C.J., and WORSWICK, J. Pro Tem., concur.

Review granted at 119 Wn.2d 1001 (1992).

---

[2]Before *Hagemann* was decided, legislation that would have made adult homes a residential use of property for zoning purposes was vetoed by the Governor. That legislation has since been reenacted. Laws of 1989, 1st Ex. Sess., ch. 9, § 815(2).