[No. 12105-4-III.   Division Three.   December 17, 1992.]

GEORGE SYROVY, ET AL, *Respondents*, v. ALPINE RESOURCES, INC., ET AL, *Appellants.*

*Albert J. Golden* and *Golden & Knowlton, P.S.,* for appellants.

*Michael V. Hubbard* and *Hubbard Law Firm,* for respondents.

SWEENEY, J. — The George Syrovy Trust[1] agreed to sell Alpine Resources, Inc., all timber from Mr. Syrovy's property produced by Alpine over a 2-year period for $140,000. Alpine produced some timber during the 2-year period and paid $50,000. Mr. Syrovy brought suit for the contract balance of $90,000. The trial court granted Mr. Syrovy's motion for summary judgment. Alpine appeals. We affirm.

FACTS AND PROCEDURAL BACKGROUND

On March 19, 1988, Mr. Syrovy and Alpine Resources, Inc., entered into a "Timber Purchase Agreement" (TPA) drafted by Ken Reoh of Alpine. The term of the agreement was for 2 years, beginning April 15, 1988, and ending April 15, 1990. Mr. Syrovy agreed to sell and Alpine agreed to buy "all the merchantable timber (12" DBH and larger) produced during the term . . .". The timber to be "sold, purchased, and delivered . . . [was to] be produced by Buyer [Alpine] from timber on Seller's land . . .".

"The total purchase price for all the commercial timber . . . [was to] be . . . $140,000.00". One thousand dollars, in earnest money, was escrowed. The earnest money was to be released to Mr. Syrovy on April 15, 1988, after Alpine completed the forest applications, verified access routes and determined that it could proceed with the harvest. The agreement then set out three different areas to be harvested and required that specified payments be made by Alpine before it commenced harvesting in the described areas. The agreement further provided:

> Time is of the essence of this agreement. The Buyer will commence with active harvesting on said land as soon as possible after the execution of this contract and will carry on a continuous operation to this end so that the road system and harvesting will be completed and delivered within the term of this contract.

---

[1]Hereafter referred to as Mr. Syrovy.

On June 1, 1988, the parties entered into a "Supplement to Timber Purchase Agreement and Receipt of Payment". Again the document was drafted by Mr. Reoh. The supplement changed the harvesting and payment schedule. Alpine verified the access and haul routes and Mr. Syrovy received the earnest money. Alpine then paid the initial $50,000 and began harvesting the first area. Alpine continued harvesting until October 1989. It stopped prior to completing the first area because of weather and the arrival of hunting season, which precluded access to the area.

After the 2-year contract with Alpine expired, Mr. Syrovy sold timber harvested from the same areas covered by the Alpine contract for $45,475.

On July 18, 1990, Mr. Syrovy filed suit against Alpine for the balance of the contract payment ($90,000) plus interest, attorney fees, and costs. Alpine answered denying the obligation and asserting impossibility of performance because of problems with access to the timber and bad weather. Alpine also claimed a right to credit for any moneys, received by Mr. Syrovy, for sales of timber from property covered by the contract.

The trial court granted Mr. Syrovy's motion for summary judgment. Thereafter, the trial court granted Alpine's motion for reconsideration and vacated the order granting summary judgment, finding a question of fact as to damages.

Mr. Syrovy again moved for summary judgment and the trial court granted the motion. Alpine appeals contending issues of fact exist as to: (1) the meaning of the terms commencing, merchantable and commercial and the quantity term in the agreement; (2) whether the agreement called for a series of options to be exercised at Alpine's discretion; (3) Alpine's defense of impossibility of performance; and (4) the measure of damages.

## STANDARD OF REVIEW

■■ This court reviews de novo a trial court's order on summary judgment and engages in the same inquiry as the trial court. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383,

394, 823 P.2d 499 (1992); *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). Whether a contract is ambiguous and the legal effect of a contract are, in general, questions of law. *Clevco, Inc. v. Municipality of Metro Seattle*, 59 Wn. App. 536, 539, 799 P.2d 1183 (1990), *review denied*, 117 Wn.2d 1006 (1991).

### AMBIGUITY — CONTRACT TERMS

The rights and obligations of the parties to this contract are controlled by article 2 of the Uniform Commercial Code (RCW 62A.2).

> A contract for the sale apart from the land . . . of timber to be cut is a contract for the sale of goods within this Article whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance.

RCW 62A.2-107(2).[2]

■ Alpine contends the absence of a quantity term precludes summary judgment. RCW 62A.2-201(1).[3] A sales contract is not enforceable beyond the quantity term stated in the agreement. RCW 62A.2-201(1); *Hankins v. American Pac. Sales Corp.*, 7 Wn. App. 316, 319, 499 P.2d 214 (1972).

---

[2] In this case the specific trees to be cut were not identified prior to their severance by Alpine. The Uniform Commercial Code still applies because the code defines a present sale as one accomplished by making a contract and a contract for sale "includes both a present sale of goods and a contract to sell goods at a future time." RCW 62A.2-106(1). This is a contract to sell goods at a future time. *See Lubecki v. Omega Logging, Inc.*, 674 F. Supp. 501 (W.D. Pa. 1987); *Outdoor Scenes, Inc. v. Anthony Grace & Sons, Inc.*, 111 Misc. 2d 36, 443 N.Y.S.2d 583 (1981); *Melms v. Mitchell*, 266 Or. 208, 512 P.2d 1336, 65 A.L.R.3d 376 (1973).

[3] RCW 62A.2-201(1) provides:

"Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

Here, both the trees to be cut and the quantity of timber (goods) were easily ascertainable in the TPA. Mr. Syrovy was required to sell and Alpine was required to buy all timber (12" DBH and larger) growing on the described land which Alpine could harvest within 2 years.

■■ Alpine also contends interpretation of the contract terms commencing, merchantable and commercial were ambiguous and, therefore, raise issues of fact. An ambiguity in a contract is present if a term is reasonably capable of being understood in either of two or more senses. *Ladum v. Utility Cartage, Inc.*, 68 Wn.2d 109, 116, 411 P.2d 868 (1966).

The TPA required that Alpine was to make specified payments "[p]rior to commencing with harvesting" certain areas of Mr. Syrovy's land. We disagree with Alpine's assertion that the payment terms in the TPA are ambiguous. "Words should be given their ordinary meaning . . .." *Corbray v. Stevenson*, 98 Wn.2d 410, 415, 656 P.2d 473 (1982). The ordinary meaning of commencing is "to begin; start". *Random House Dictionary of the English Language* 411 (2d ed. 1987). Payments were to be made before Alpine began its harvest of timber in each of three areas. The term "commencing" is not ambiguous.

Alpine further agreed "to purchase all the merchantable timber (12" DBH and larger) produced during the term . . .". The "total purchase price for all the commercial timber . . . [was to] be . . . $140,000.00." In ordinary usage, commercial means "prepared, done, or acting with sole or chief emphasis on salability, profit, or success . . .". *Random House Dictionary of the English Language* 411. Merchantable in the timber industry means suitable for lumber or having commercial value. 52 Am. Jur. 2d *Logs and Timber* § 2 (1970). Thus, both terms define goods capable of being sold. Alpine offers no alternative definitions and more significantly offers no explanation regarding what effect the claimed ambiguities might have on the obligations of the parties.

This contract dealt with timber that could be sold. In fact, Alpine accepted the timber harvested without objecting to its merchantability or commercial value.

■ The contract terms were not ambiguous and, therefore, do not present issues of fact precluding summary judgment.

### OPTIONAL NATURE OF CONTRACT

Alpine contends the TPA is a series of options for Alpine to cut (and pay for) timber, from specifically described land, rather than a single sale calling for installment payments, as Mr. Syrovy maintains. Alpine, therefore, concludes that it was neither obligated to harvest nor pay for options which it did not exercise. *Fisher v. Elmore*, 610 F. Supp. 123 (E.D.N.C. 1985) (logger under no obligation to cut timber identified to contract when cut), *aff'd*, 802 F.2d 771 (4th Cir. 1986).

RCW 62A.2 does not address the issue raised and, therefore, principles of contract law apply. RCW 62A.1-103. An option is the "[r]ight of election to exercise a privilege", while installments are "[d]ifferent portions of the same debt payable at different successive periods . . .". Black's Law Dictionary 1094, 798 (6th ed. 1990). A party with an option has a choice. 1A A. Corbin, *Contracts* § 259 (1963).

Alpine agreed to pay $140,000 for all the timber (12" DBH or larger) it could produce from the described property during a 2-year period. The TPA does not mention the word "option" in its title or its terms nor does it describe a "choice" regarding Alpine's performance. It specifies that time is of the essence and that the work should be continuous so that the "*harvesting will be completed and delivered*" within the 2-year term. (Italics ours.) The TPA called for one sale with periodic partial payments on the $140,000 sales price, rather than a series of options.

■ Alpine's reliance on *Fisher* is misplaced. In *Fisher*, the agreement called for payment to occur after the logs were harvested and payment was dependent upon the quantity of timber harvested. The buyer was under no obligation to

harvest any timber. *Fisher*, at 124-25. Here, payment was not dependent on the quantity of timber harvested; Alpine was obligated to pay regardless of whether the timber was harvested. The TPA was not a series of options.

### IMPOSSIBILITY OF PERFORMANCE

■ Alpine next contends its defense of impossibility of performance precludes summary judgment. The commercial transaction before us does not readily fit those anticipated by RCW 62A.2. Usually, the seller of goods is responsible for production. RCW 62A.2-615 affords a defense to the seller's performance based on impracticability. Here, the contract relegated control over production to the buyer. Accordingly, it is the buyer who asserts impracticability as a defense. Nevertheless, cases construing RCW 62A.2-615 are instructive because the operative term is "impracticability" — regardless of which party is responsible for production. Moreover, our analysis is in accord with general principles of contract law which control the issue of impracticability. *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 439, 723 P.2d 1093 (1986); *Thornton v. Interstate Sec. Co.*, 35 Wn. App. 19, 30-31, 666 P.2d 370, *review denied*, 100 Wn.2d 1015 (1983).

■ ■ "The narrow defense of 'impossibility' has been subsumed in the . . . broader theories of 'impracticability' " in the Uniform Commercial Code. *Harper & Assocs. v. Printers, Inc.*, 46 Wn. App. 417, 419, 730 P.2d 733 (1986), *review denied*, 108 Wn.2d 1002 (1987). Article 2 recognizes impracticability as a defense to performance when a seller is unable to deliver goods:

> Except so far as a seller may have assumed a greater obligation . . .:
> (a) Delay in delivery . . . is not a breach . . . if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made . . ..

RCW 62A.2-615. The Washington Comments to this code section suggest that performance is excused if events occur that are not foreseen or anticipated — a "wholly unexpected contingency". RCWA 62A.2-615. Difficulties that are assumed by

a party, at the time of contracting, cannot form the basis of an impracticability defense. *Harper*, at 421.

Alpine argues that the winters of 1988 and 1989 were so severe that harvesting became impossible. However, Mr. Reoh is a logger with considerable experience in purchasing timber. It would be unreasonable to suggest that weather conditions were an unforeseeable event. Also, there is no evidence to support the assertion that the weather was so remarkable that contract performance was impossible. *Meissner v. Simpson Timber Co.*, 69 Wn.2d 949, 955-56, 421 P.2d 674 (1966) (in reviewing a summary judgment decision, the court may pierce a party's allegations and look to the factual evidence upon which the party relies).

Alpine also argues that it did not have access to the property during hunting season. The terms of the contract provided Alpine with 30 days in which it could verify "access and haul routes." Having verified the routes, it accepted the risk of access problems when it proceeded with the contract. Access problems were foreseeable and the risk was allocated in the contract. The problems cannot be asserted as a basis for an impracticability defense. *Harper*, at 421. In sum, Alpine's defense presents no issue of fact.

### MEASURE OF DAMAGES

Alpine finally contends this action for the contract price is governed by RCW 62A.2-709(2), which provides that if Mr. Syrovy resells timber identified in the TPA, proceeds of the resale must be credited to Alpine. *Sprague v. Sumitomo Forestry Co.*, 104 Wn.2d 751, 709 P.2d 1200 (1985).

Alpine accepted the timber it produced during the 2-year period called for in the contract, but failed to pay the contract price. Mr. Syrovy is entitled to recover the $90,000 still due under the contract for the timber produced. He is not obligated to credit Alpine for any timber he resold. Any timber left at the end of the 2-year contract term was not timber he agreed to sell or Alpine agreed to buy.

*Sprague v. Sumitomo Forestry Co.*, *supra*, relied on by Alpine, is distinguishable. In that case, timber identified to a contract was resold. *Sprague*, at 754-55. The court properly

set as the measure of damages the difference between the contract price and the resale price. *Sprague*, at 754-55. Here, the only timber identified to the contract was that timber produced by Alpine during the 2-year term of the contract. Mr. Syrovy did not resell any timber "identified to the contract" with Alpine and, accordingly, there was no breach of contract.

For the contract price, Alpine agreed to purchase all merchantable timber it could harvest during the 2-year period. These goods were delivered and Alpine is obligated to pay for them.

We affirm.

THOMPSON, A.C.J., and MUNSON, J., concur.

Review granted at 121 Wn.2d 1008 (1993).