[No. 59058-3. En Banc. July 15, 1993.]

MAINS FARM HOMEOWNERS ASSOCIATION, ET AL,
*Respondents*, v. SALIMA WORTHINGTON,
ET AL, *Petitioners*.

---

*Millet & Mauhar* and *Alan E. Millet; Joseph B. Lavin,* for petitioners.

*Johnson & Williams,* by *Ken Williams,* for respondents.

*Jeff B. Crollard, Cathy Blinka, Lonnie Davis, William L.E. Dussault, Howard Graham,* and *F.H. "Bud" Oakes* on behalf of Alzheimer Society of Washington, United Cerebral Palsy of King-Snohomish Counties, Washington Coalition of Citizens With Disabilities, Washington State Long-Term Care Ombudsman Program, Washington Protection and Advocacy System, Adult Licensed Facilities of Washington, Adult Family Home East-West United, Sea-Tac Adult Family Home Association, Sno-King Adult Family Home Association, Washington State Head Injury Foundation, Association for Persons With Severe Disabilities, and Disabilities Research and Information Coalition, amici curiae for petitioners.

*Christine O. Gregoire, Attorney General,* and *Brian E. Buchholz* and *Robert L. Schroeter, Assistants,* amicus curiae.

BRACHTENBACH, J. — ■ This is an action for an injunction to prevent defendant from operating an adult family home business in her residence on a residential lot in the Mains Farm plat. The trial court on summary judgment motion granted an injunction. The Court of Appeals affirmed. *Mains Farm Homeowners Ass'n v. Worthington,* 64 Wn. App. 171, 824 P.2d 495 (1992). We affirm, emphasizing that the limited record prevents consideration of important broad public policy issues which defendant and amici attempt to raise, mainly after conclusion of trial court proceedings. In reviewing the grant of a summary judgment, we take the position of the trial court and review questions of law de novo. *DuVon v. Rockwell Int'l,* 116 Wn.2d 749, 753, 807 P.2d 876 (1991).

A declaration of protective covenants covering the Mains Farm plat was recorded in 1962. Defendant purchased her residential lot, with a house on it, in 1987. Before purchasing, defendant obtained and read a copy of the protective covenants.

The relevant protective covenants are these:

(1) All lots or tracts in MAINS FARM shall be designated as 'Residence Lots,' and *shall be used for single family residential purposes only.*

. . . .
No structure shall be erected, altered or placed on the plat of MAINS FARM which shall serve as other than a *single family* dwelling unit . . ..

(Italics ours.) Brief of Appellant app. A.

Defendant occupies the residence together with four adults who pay her a total of between $24,000 and $48,000 per year (the record is not more specific) for 24-hour care, 7 days a week.

To operate her for-profit enterprise in the residence, defendant must be licensed and inspected by the State. The people living there cannot be children. They cannot be related to her. Defendant and her employees must provide 24-hour protective supervision and care. By law, those occupants must require supervision or health care beyond board and room. In fact, those occupants are unable to do their own housekeeping, prepare their own meals, or attend to their personal hygiene. WAC 388-76-030(2), (3), (7); Clerk's Papers, at 136.

By law, defendant could not operate this business if she were under the age of 21, nor if she had certain criminal convictions. Defendant, by law, could not operate this business without demonstrating that she, *and her family members, other relatives and friends,* regularly on the premises (*i.e.,* unmonitored access) are free of the same convictions. In addition, the defendant, her family members, other relatives *and friends* must demonstrate to the satisfaction of the State that she and they "have the understanding, language skills, physical health, emotional stability, personality, and professional skills suited to meet the physical, mental, emotional, and social needs" of the occupants under care. Former WAC 388-76-070; WAC 388-76-030(10).[1]

This is an action for an injunction. Therefore, it is addressed to the equitable powers of the court. The criteria for an injunction are set forth in *Port of Seattle v. International Longshoremen's & Warehousemen's Union,* 52 Wn.2d 317, 319, 324 P.2d 1099 (1958). As we have said: "the listed

---

[1]These are the WAC's that were then applicable.

criteria must be examined in light of equity including balancing the relative interests of the parties and, if appropriate, the interests of the public." *Tyler Pipe Indus. Inc. v. Department of Rev.*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982). Those criteria are not argued here, but application of equitable principles is important. *Before* defendant bought the premises, she *read* the restrictive covenants. She had moved out of her prior adult care home because of opposition from neighbors. Written opposition by plaintiffs was made known to defendant immediately after her purchase. Clerk's Papers, at 128-29, 132. Despite that knowledge, defendant applied for a building permit to add a fifth bedroom by converting the garage to a bedroom, adding another bathroom and otherwise enlarging the residence. She was advised by the County that her intended facility did not comply with applicable zoning. She later obtained the permit by stating that only her family would be living with her. In her words: "I told them what they wanted to hear". Clerk's Papers, at 174.

These equitable considerations must be kept in mind when turning to the standards of interpretation. First, "[i]n Washington, owners of land have an equitable right to enforce covenants by means of a general building scheme designed to make it more attractive for residential purposes, without showing substantial damage from the violation." (Citations omitted.) *Hagemann v. Worth*, 56 Wn. App. 85, 88, 782 P.2d 1072 (1989).

Second, "[t]he primary objective in interpreting restrictive covenants [protective covenants are equally descriptive] is to determine the intent of the parties . . .". (Footnote omitted.) *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 179, 810 P.2d 27, *review denied*, 117 Wn.2d 1013 (1991). In determining intent, language in the covenant is to be given its "ordinary and common use". *Krein v. Smith*, 60 Wn. App. 809, 811, 807 P.2d 906, *review denied*, 117 Wn.2d 1002 (1991).

Defendant argues restrictive covenants are to be strictly construed against the grantor and those claiming the benefit

of the covenant. *Hunter Tract Imp. Co. v. Corporation of Catholic Bishop*, 98 Wash. 112, 114, 167 P. 100 (1917). The use of the word "grantor" is an obvious clue to the fact that the *Hunter* court was referring to the grantor in a deed which poses a different problem. Construction against the grantor who presumably prepared the deed is quite a different matter from construction of covenants intended to restrict and protect all the lots of a plat and future owners who buy and build in reliance thereon. That issue is not addressed by the parties.

However, such a rule of strict construction should be reexamined in an appropriate case with a proper record. The premise that protective covenants restrict the alienation of land and, therefore, should be strictly construed may not be correct. "Subdivision covenants tend to enhance, not inhibit, the efficient use of land. . . . In other words [it is argued], covenants prevent land from moving to its most efficient uses. *In the subdivision context, the premise generally is not valid.*" (Footnote omitted. Italics ours.) Brussack, *Group Homes, Families, and Meaning in the Law of Subdivision Covenants*, 16 Ga. L. Rev. 33, 42, 44 (1981-1982).

 The strict construction rule is not of significance here because we give the language its ordinary and common use and do not read the covenant so as to defeat its plain and obvious meaning. This leads to the conclusion that defendant's commercial use is prohibited. *Lakes at Mercer Island Homeowners Ass'n v. Witrak, supra* at 180.

To reach this conclusion, we consider the first question which is the meaning of "single family". This phrase must be interpreted. The cases interpreting "family" are legion. Annot., *What Constitutes a "Family" Within Meaning of Zoning Regulation or Restrictive Covenant*, 71 A.L.R.3d 693 (1976). Any of the cases must be used with caution. The word "family" may be defined by an applicable zoning ordinance, a matter not presented by this record. Some cases involve a state statute which bears a different relationship to zoning powers than to vested property rights embodied in a restrictive covenant.

■ No purpose will be served by examining and comparing in detail the numerous cases which define "family". Because of the widely differing documents being interpreted, the contexts in which the word is used and the fact-specific circumstances, it is impossible to arrive at a single, all-purpose definition. The possible definitions range from limiting the "family" to the historical, traditional persons related by blood, marriage or adoption to "a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit." *Crowley v. Knapp*, 94 Wis. 2d 421, 437, 288 N.W.2d 815, 823 (1980); *Adult Group Properties, Ltd. v. Imler*, 505 N.E.2d 459 (Ind. Ct. App. 1987).

Likewise, attempting to use one of the many dictionary classifications solves nothing. It has been observed:

> First, although a group home may meet one of the dictionary definitions of "family," the focus must be on the contextual meaning of the word rather than the range of linguistically permissible meanings. Second, the fact that a group home is set up to emulate family behavior should not be regarded as a sufficient condition for family status within the social meaning of a single-family-use covenant.

Brussack, at 55. For similar reasons, the use of a phrase or two out of a dictionary to define "residential" for purposes of this covenant is not acceptable.

Both ends of the possible definitional spectrum are unsatisfactory. On the one hand, in today's society most people, if put to this inquiry, probably would conclude that for this purpose, "family" means something more than only persons related by blood, marriage or adoption. On the other hand, in this context, it is likely most people would reject the notion that "family" includes any group of people who happen to share a common roof and table. Some reflection leads us to attribute certain characteristics to a concept of "family", even in the extended sense. These include: (1) a sharing of responsibilities among the members, a mutual caring whether physical or emotional, (2) some commonality whether it be friendship, shared employment, mutual social or political interest, (3) some degree of existing or contemplated per-

manency to the relationship, and (4) a recognition of some common purpose, persons brought together by reasons other than a referral by a state agency. Under those considerations, it would be unlikely that total strangers would be brought together, that there would be no tie to the residence itself, or that one would leave or another stranger arrive at any time and without disruption to a for-profit operation.

The law review article cited above engages in a lengthy and philosophical analysis of the attributes of the "subdivision covenant concept of family." Interestingly, and significantly, the author concludes: "Finally, suppose the group home is a profit-making operation for the dependent elderly. Here a well-socialized speaker of English [the author's hypothetical interpreter] almost certainly would deny the appellation 'family' in favor of 'nursing home.' " Brussack, at 62.

Here, we have four persons, all strangers before arriving at this residence. By law, they cannot be related to the defendant by birth, adoption or marriage. By law, they cannot be below the age of 18. By regulatory definition, they must require 24 hour protective supervision and care. By law, defendant or an employee must be available on premises 24 hours a day, 7 days a week. By law, other persons regularly on the premises, including defendant's relatives, family members *and friends* must have specified "language skills, physical health, emotional stability, personality, and professional skills" suited to care for the other "family" members. WAC 388-76-070. Defendant cannot form this family without a license from the State which must approve the "family home" site, and which agency is free to inspect it. Defendant meets these qualifications and provides around-the-clock care as a means of making a living, to the extent of $24,000 to $48,000 a year.

These are not the characteristics of a single family residence. The primary goal is to ascertain the intent of these protective covenants, and to accord the words their ordinary and common usage. The reasonable expectations of the other lot owners who bought their family houses in reliance on the

long recorded covenants would not include a state-licensed, 24-hour operating business.

The next focus must be on the second, but separate restriction, *i.e.*, these premises can be used *only* for *residential* purposes. It is most important to note that this focus is on *purposes*. This distinguishes cases where the restriction was on the nature of the *structure*, rather than the *purposes* to which it was put. Annot., *Community Residence for Mentally Disabled Persons as Violation of Restrictive Covenant*, 41 A.L.R.4th 1216, 1219 (1985).

Defendant argues that *Hunter Tract Imp. Co. v. Corporation of Catholic Bishop, supra*, is controlling. *The* Hunter *case is markedly different.* The restriction there provided that the residence was to be used for residence purposes only. *It did not limit it to single family residence purposes only.* The court was explicitly clear that such was the very narrow question presented: "The question at issue is, is the property occupied for other than residence purposes only." *Hunter*, at 113. Living in the house were 12 or 15 Catholic nuns. The court's analysis and answer were simple: "We can find nothing in this record other than the fact that a number of the sisterhood of the Ursulines make this their home or residence . . .". *Hunter*, at 116.

In fact, the *Hunter* case points up exactly what is wrong with the defendant's theory in this case. First, it explains what the nuns called the place was immaterial. Equally immaterial is the fact that defendant is licensed as an adult family "home". The court said: "The restriction is not against names, but purposes." *Hunter*, at 114. Exactly so here. The purpose here is to run a paid, full-time, state-licensed business. The name is not material. Second, and more important, in *Hunter*, it was complained that the nuns invited the public on one occasion to observe admission of certain persons into the sisterhood. The court rejected that argument, but in so doing drew an important distinction — a distinction which demonstrates clearly that *Hunter* does not support the defendant. The court stated: "It seems to us there is

a wide difference between an occasional and an habitual and customary use. The first is a mere incidental use, the second may, under proper facts, be considered as the main use and purpose." *Hunter*, at 115. In this case the "main use and purpose" is not to provide a single family residence, but to provide 24-hour protective care and supervision in exchange for money.

The covenant in *Hunter* was vastly different. It restricted the property to use as a residence and that is exactly how it was used. The distinction drawn in *Hunter* between mere incidental and occasional use and habitual and customary use is precisely the line which must apply in this case.

■ More in point is *Hagemann v. Worth*, 56 Wn. App. 85, 782 P.2d 1072 (1989). It is not cited by defendant. Its analysis is sound and its reasoning persuasive. In *Hagemann* the covenant restricted buildings to "single-family residences". *Hagemann*, at 87. Thus, it did not contain the single family residential *purposes only* as is present here. However, it additionally did prohibit "business, industry or commercial enterprise of any kind or nature". *Hagemann*, at 87. However, the *Hagemann* court did not limit itself to the business prohibition. It said:

> Our conclusion is bolstered by the other covenants . . . which reflect the plat was designed for "residential purposes". The term business is the antonym of residential and *to provide residence to paying customers is not synonymous with a residential purpose. Seaton v. Clifford*, [24 Cal. App. 3d 46,] 100 Cal. Rptr. [779], at 781 [(1972)] (operation of a state-licensed home for six mentally retarded persons constituted a business) . . ..

(Footnote omitted. Italics ours.) *Hagemann*, at 91.

The facts in *Hagemann* are remarkably similar. The home was first licensed as an adult family home, just as is defendant's. Because of an increase in the number of residents, the operators secured a boarding home license, but the court enjoined both operations. The amount paid by the residents depended on the level of care required, just as in this case. The operators in *Hagemann* primarily derived their living from operation of their group home, just as does defendant.

They remodeled the home to accommodate the occupants, just as did defendant. They had employees other than family members, just as does defendant on occasion. The court observed, and we agree:

> While the Worths' purpose in providing room, board, and services may be charitable in nature, as reflecting their loving and compassionate concern for the elderly, they are nevertheless making a living providing this service. . . . We conclude their activity in providing foster or boarding house care constitutes a business.

*Hagemann*, at 90-91.

Pursuant to *Hunter Tract Imp. Co. v. Corporation of Catholic Bishop*, 98 Wash. 112, 167 P. 100 (1917), the court must distinguish between an incidental use and the main use and purpose. Applying the principles of *Hagemann v. Worth*, *supra*, that a business use is the antonym of residential purpose only, it must be concluded that plaintiffs are entitled in equity to the injunction granted by the trial court.

The decision of the trial court merits attention for it correctly and cogently summarized the basis for its decision:

> As mentioned, defendant's use includes a commercial element because she receives payment for the care that she gives the unrelated adults in her home. In addition, the defendant is required by the state license to provide twenty-four-hour-a-day care for those persons. The single-family residential nature of defendant's use of her home is destroyed by the elements of commercialism and around-the-clock care that must be accorded to the unrelated persons who occupy her home. The use to which the defendant puts her house is more institutional in nature than it is familial.

Clerk's Papers, at 15-16.

As an alternative ground for reversing the trial court, defendant argues that the protective covenant violates a legislative declaration of public policy and is therefore void. ██ The public policy question should not be resolved in this case for five reasons:

1. The record is not adequate to identify the facts and policies upon which such a significant public policy should be considered.

It is true that the Legislature has found "that adult family homes are an important part of the state's long-term care sys-

tem. Adult family homes provide an alternative to institutional care and promote a high degree of independent living for residents." RCW 70.128.005. Unfortunately, this record shows little more. We do know that the Legislature has not implemented this finding beyond declaring in RCW 70.128-.175(2) that such home is considered residential for *zoning* purposes, and that declaration is limited to that *section*. There is no evidence of the number of persons qualified for adult family homes, nor, more importantly, whether that need is being met. We know nothing of the success of placing such homes under the *zoning* definition. We know nothing of the particular situation in the community or the county in which the subject property is located. We do not know whether there exists an adequate supply of such homes in areas not subject to restrictive covenants. We are unaware whether efforts by individuals or governmental units have been successful in locating such homes either without neighborhood opposition or by successful negotiation with concerned owners.

We have not been made aware of what coordinated efforts, if any, are being made by state or local agencies to establish adult family homes.

All of these considerations are relevant to this court finding (1) that such a statewide public policy exists; (2) that there is a need which is not being met; (3) that other efforts are or are not being undertaken to meet a need (the extent of which is missing entirely from this record); (4) whether there is a public policy intended to override existing protective covenants; (5) whether the restriction of RCW 70.128-.175(2) to *zoning* was a deliberate legislative effort to avoid conflict with existing protective covenants; and (6) a determination of the effect of such asserted policy on existing contractual rights and the concomitant question of a governmental taking. With this perspective in mind, we turn to the other grounds for not adopting the defendant's public policy arguments. We emphasize that we express no opinion in relation thereto other than as necessary to explain why we do not resolve the public policy question.

2. The statute relied upon by defendant as the source of public policy was not effective until *after* the written opinion of the trial court, and was not cited to the trial court. Reversal should not occur under these facts.

Defendant relies on RCW 70.128.175(2) as the source of the legislative declaration of public policy. That section is derived from a 124-page bill creating the Department of Health. It became effective July 1, 1989. Laws of 1989, 1st Ex. Sess., ch. 9, §§ 103, 815, 825. The trial court had rendered its written opinion *May* 24, 1989, more than a month earlier. Clerk's Papers, at 12-16. The statute was not cited to the trial court.

The section which defendant relies on, RCW 70.128.175(2), by its very terms is limited to *zoning*. It reads:

> An adult family home shall be considered a residential use of property for *zoning* purposes. Adult family homes shall be a permitted use in all areas zoned for residential or commercial purposes, including areas zoned for single family dwellings.

(Italics ours.) When the Legislature intends to affect a *private land use restriction* (*i.e.*, a covenant) as compared to *zoning*, it does so explicitly, *e.g.*, RCW 35.51.010(4), (5). Perhaps the Legislature in restricting RCW 70.128.175(2) to zoning recognized the legal difficulties of possible impairment of contract and governmental taking, raised by plaintiff here.

3. The statute, even if applicable, is very limited in scope and purpose. It does not show a legislative intent to declare a general public policy sufficient to override a contractual property right. Defendant does not recognize the first section, RCW 70.128.175(1) which reads:

> Unless the context clearly requires otherwise, these definitions shall apply throughout this *section* and RCW 35.63.140, 35A.63.149, 36.70.755, 35.22.680, 36.32.560, and 70.128.180 . . . .

First to be noted is that the application is limited to this *section*, not the entire act, and to specific referenced statutes. In other words, the directive that an adult family home is considered a residential use for zoning purposes is limited

to that particular *section* and the cited statutes. Subsection (2), relied upon by defendant, is part of *section* 815, Laws of 1989, 1st Ex. Sess., ch. 9. The referenced statutes relate to residential care facilities which, by definition, do not include the facility here involved. RCW 70.128.175(1)(b).

4. The cases from other jurisdictions cited by defendant generally do not hold what is claimed. They either do not reach the policy conflict, or are based upon entirely different statutory direction or even constitutional dictates.

Turning first to the three out-of-state authorities cited by defendant in her opening brief to support the public policy argument, we find defendant provides only two pages of analysis of those cases. Brief of Appellant, at 7-8. First cited is *Welsch v. Goswick*, 130 Cal. App. 3d 398, 181 Cal. Rptr. 703 (1982), which defendant claims to have held that public policy takes precedence over a covenant. Defendant ignores the fact that the California statute specifically recognized that its enactment did not affect *existing* covenants. It applies only to covenants executed after the statute. The only use of policy made by the court was in interpreting an existing covenant. That is, the court used the statutory policy to interpret an existing covenant. There simply is no such declaration of public policy applicable in the case at bar.

Moreover, considerable doubt is cast on the *Welsch* case by a subsequent case, *Barrett v. Lipscomb*, 194 Cal. App. 3d 1524, 240 Cal. Rptr. 336 (1987), which is not cited. The *Barrett* court specifically rejected the reasoning and holding upon which defendant relies. The *Barrett* court said: "In our view, the *Welsch* court impermissibly rewrote the statute at issue by deleting the words 'executed on or after January 1, 1979.' " (Footnote omitted.) *Barrett*, at 1530. Completely destroying support for defendant's reliance is this statement:

> We reject as unpersuasive the *Welsch* court's holding that the strong statement of public policy of integrating residential care facilities into single family residential areas justifies overriding the clear legislative intent that as to private agreements relating to property use the statute is prospective only in application. . . . Nowhere in the statutes is there evidence of any legislative intent that a residential care facility be defined

as a single family residence for purposes of private agreements, deeds or covenants for the transfer of real property executed prior to January 1, 1979.

(Footnote omitted.) *Barrett*, at 1531.

The *Barrett* case is much more persuasive, but neither case supports defendant. The California statute is in stark contrast to the Washington law. There the statute specifically recognized its application to future covenants. Here the statute excludes private covenants by expressly limiting its application to zoning only.

Next defendant cites *Westwood Homeowners Ass'n v. Tenhoff*, 155 Ariz. 229, 745 P.2d 976 (Ct. App. 1987). In a 2-to-1 opinion the Arizona Court of Appeals followed the California case of *Welsch v. Goswick, supra* (rejected by the later *Barrett v. Lipscomb, supra*) and found a public policy in a statute which specifically included subsequent private covenants. Factually, the Arizona case is distinguishable. The court had extensive legislative history about care facilities in existence *before* passage of the statute pursuant to a public policy which the statute "simply articulated". *Westwood*, at 234. No such showing exists here. Further, the Arizona statute was a comprehensive scheme, compared to the one statutory sentence here, for it prohibited siting a care facility within a 1,200-foot radius of an established facility. *Westwood*, at 237.

Finally, defendant's third cited case is *Crane Neck Ass'n v. New York City/Long Island Cy. Servs. Group*, 61 N.Y.2d 154, 460 N.E.2d 1336, 472 N.Y.S.2d 901, *cert. denied*, 469 U.S. 804, 83 L. Ed. 2d 11, 105 S. Ct. 60 (1984). Again, the law and facts of that case distinguish the cited case. New York had a 30-year history of executive and legislative attention to the problem. Five statutes had been enacted to accomplish the declared goal to deinstitutionalize the concerned groups. There was an extensive legislative history which expressed concerns about litigation thwarting such integration into communities. One statute encouraged "a process of joint discussion and accommodation between the providers of care and services to the mentally disabled and representatives of

the community, rather than legal antagonism." *Crane Neck*, at 164. In fact, the parties in *Crane Neck* had followed the siting procedures and had litigated the issue of location. Again, there simply is no comparable legislative scheme present in this case.

In a supplemental brief defendant cites additional cases for the proposition that public policy overrides protective covenants. Again, examination of those cases shows that those cases do not support defendant's argument. In *Turner v. United Cerebral Palsy Ass'n*, 772 P.2d 628, 630 (Colo. Ct. App. 1988), the court held that the home did not violate the covenant. Any discussion of public policy was pure dicta. *State ex rel. Region II Child & Family Servs., Inc. v. District Court of Eighth Judicial Dist.*, 187 Mont. 126, 128, 609 P.2d 245 (1980) specifically did not rely on a public policy theory, but rather looked to a provision in the state constitution to determine that the covenant was not violated. Likewise, *Gregory v. Department of Mental Health, Retardation & Hosps.*, 495 A.2d 997, 1002 (R.I. 1985) involved only an interpretation of the covenant rather than a finding that the covenant was invalid.

In short, the cases relied on by defendant do not support the bald assertion that public policy invalidates an existing protective covenant.

The point is aptly summarized: "[C]ourts should not equate the concern of zoning laws with the concerns of restrictive covenants." Guernsey, *The Mentally Retarded and Private Restrictive Covenants*, 25 Wm. & Mary L. Rev. 421, 454 (1984).

5. The additional grounds relied upon by defendant and amici are raised *only* by amici or only in defendant's supplemental brief and should not be considered under our well-established rules.

In her supplemental brief, defendant for the first time tries to claim violation of RCW 49.60, the Law Against Discrimination. We need not consider issues first raised in a supplemental brief. *Douglas v. Freeman*, 117 Wn.2d 242, 258, 814 P.2d 1160 (1991).

■ Amici raise a claimed violation of the Federal Fair Housing Act, 42 U.S.C. § 3601. We do not consider issues raised first and only by amicus. *Coburn v. Seda*, 101 Wn.2d 270, 279, 677 P.2d 173 (1984).

In summary, we affirm the trial court and the Court of Appeals. We hold that under the equities of these particular facts, the discretionary grant of an injunction was proper. We caution that the interpretation of a particular protective covenant is largely dependent upon the facts of the case at hand. Our holding should not be construed as an encompassing declaration concerning covenants and uses under other circumstances. Likewise, our rejection of the claimed public policy is limited to the facts herein, especially due to the lack of any comprehensive presentation of governmental goals, efforts, needs and successes existing in fact.

These holdings avoid the necessity of reaching plaintiffs' claims of impairment of contract and governmental taking.

ANDERSEN, C.J., and UTTER, DOLLIVER, SMITH, and GUY, JJ., concur.

DURHAM, J. (dissenting) — The majority opinion comes to three conclusions: first, that justice/equity is on its side; second, that Salima Worthington, her children, and her elderly charges do not constitute a family; and third, that Worthington's supplemental use of her home to care for elderly adults is a nonresidential use. I contend that as to each aspect, the majority is in error.

First, the majority suggests that Salima Worthington should be estopped from caring for her adult family members because she was aware of the subdivision covenants prior to purchase, and was later informed of the Mains Farm Homeowners Association's (Homeowners) opposition. However, Worthington's position has been consistent throughout this litigation. She has always argued that the supplemental use of her home to care for her adult family members *complies* with

the covenant requiring "single family residential purposes only". As her affidavit reveals:

> Prior to purchasing the home I read the covenants which limit use of the property to single family dwellings. *I had no intentions of using the property for any commercial purpose and felt my use of the property for my family and my adult family members was permissible.* I was not aware that any of my neighbors had any objections to my use of the home until after I moved in.

(Italics mine.) Clerk's Papers (CP), at 158; *see also* CP, at 128-29. Moreover, Worthington had received information from an authoritative source that her interpretation was a reasonable one:

> I contacted my DSHS Supervisor, Cheryl Everett, before I purchased the home and was advised that they do not approve any living arrangements as an "adult family home" which is other than a single family residence.

CP, at 158. If anything, the equities favor allowing Worthington to continue her care of elderly adults.

Second, whether Worthington's adult family home satisfies the covenant's "single family" prong is *not* an issue before this court. Although the trial court concluded that Worthington's use of her home was more commercial than residential, it also held that the adult family home satisfied the covenant's "single family" requirement. CP, at 15. Neither the petition for review, nor the answer, takes issue with the trial court's "single family" holding. As such, the scope of review is confined to the issues presented by the parties. *State v. Rowe*, 93 Wn.2d 277, 280, 609 P.2d 1348 (1980); RAP 13.7(b). Moreover, upon failure to challenge this issue, the trial court's holding that Worthington's home constitutes a single family became law of the case. *See Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988).

Finally, the majority determines that Worthington's supplemental use of her home to care for elderly adults contravenes the covenant's "residential purposes only" prong. This conclusion is incorrect. In interpreting a covenant, language is to be given its "ordinary and common use". *Krein v. Smith*, 60 Wn. App. 809, 811, 807 P.2d 906, *review denied*, 117

Wn.2d 1002 (1991). We usually divine the ordinary meaning of words by resort to dictionary definitions. *See, e.g., Corbray v. Stevenson*, 98 Wn.2d 410, 415, 656 P.2d 473 (1982); *Syrovy v. Alpine Resources, Inc.*, 68 Wn. App. 35, 40, 841 P.2d 1279 (1992), *review granted*, 121 Wn.2d 1008 (1993). However, the majority rejects dictionary definitions of "residential", relying instead on what "most people" in today's society "probably would conclude". Majority, at 817-18. This approach lacks any principled boundaries.

The dictionary definition of "residential" is "used, serving, or designed as a residence or for occupation by residents[.]" *Webster's Third New International Dictionary* 1931 (1971). A "residence" is defined as "the place where one actually lives . . . a temporary or permanent dwelling place[.]" *Webster's*, at 1931; *see also Blevins v. Barry-Lawrence Cy. Ass'n for Retarded Citizens*, 707 S.W.2d 407 (Mo. 1986). Clearly, Worthington, her children, and her adult family live and dwell in the Mains Farm subdivision. They reside in Worthington's home on a 24-hour basis and stay at the home for an indefinite period of time. In this regard, then, there is no doubt that Worthington's use of her home complies with the covenant's restriction. As one court has noted, "the underlying theory behind establishing such a home is that it serves as a surrogate family arrangement." *Blevins*, at 408.

Despite these ostensibly residential characteristics, the majority accepts the Homeowners' argument that the "commercial" attributes of Worthington's supplemental use of her home to care for elderly adults violates the covenant's prescription that a use be for "residential purposes *only*". The pertinent analysis for this issue is found in the 1917 decision of *Hunter Tract Imp. Co. v. Corporation of Catholic Bishop*, 98 Wash. 112, 167 P. 100 (1917).

In that case, a restrictive covenant which limited use to "residence purposes only" was interpreted to allow a home being used as a convent for 12 to 15 Ursuline nuns. *Hunter Tract*, at 113. The question before this court was if the Ursulines' particular use of the property violated the restrictive language. In making this determination, this court did

not focus on the characterization of the house as a convent, but on the activities that took place there — "[t]he restriction is not against names, but purposes". *Hunter Tract*, at 114. This court found that neither the fact of regular religious services, specialized clothing, nor numerous residents negated the residential nature of the home. *Hunter Tract*, at 114-15. Instead, the crucial inquiry was whether the home was "habitually" used for nonresidential purposes, such as the training of young women for the sisterhood. *Hunter Tract*, at 115. Although there was some evidence that ceremonies inducting young novices occurred at the residence, this court noted that: "[i]t seems to us there is a wide difference between an occasional and an habitual and customary use. The first is a mere incidental use, the second may, under proper facts, be considered as the main use and purpose." *Hunter Tract*, at 115.

Although the majority purports to apply *Hunter Tract*, it errs by not giving sufficient weight to the concept that an incidental business use *does not* negate a home's residential character. The majority instead relies upon a per se rule announced by the Court of Appeals in another restrictive covenant case, *Hagemann v. Worth*, 56 Wn. App. 85, 782 P.2d 1072 (1989), which contains the statement that a business use is the antonym of residential purposes only. Majority, at 820-21. For the following reasons, I would adhere to the incidental use approach announced in *Hunter Tract*.

First, the wisdom underlying the *Hunter Tract* decision that an incidental use should not override a home's main function remains valid today. As a general matter, it is by no means clear that a commercial or business use always operates to the absolute and direct exclusion of a residential one. *Beverly Island Ass'n v. Zinger*, 113 Mich. App. 322, 326, 317 N.W.2d 611, 29 A.L.R.4th 723 (1982); *see also Metzner v. Wojdyla*, 69 Wn. App. 405, 411, 848 P.2d 1313 (1993) ("small-scale child care is an activity that is customarily incident to the residential use of property"); *Burton v. Douglas Cy.*, 65 Wn.2d 619, 399 P.2d 68 (1965) (covenant prohibiting business use did not preclude use as a social club). Many people

derive income from home-based enterprises which are completely compatible with the residential nature of the premises. Such activities might include babysitting, writing a book, working at a home office, or hosting a business dinner. The mere fact that one does more than simply eat, sleep, and watch television in his or her family home does not convert the premises from a residence into a commercial establishment; a residential use has many practical components. *See Hunter Tract*, 98 Wash. at 115. Instead, "the focus must be on the activity involved and how it parallels the ordinary and common meaning of use for residential purposes". *Beverly Island*, 113 Mich. App. at 327; *accord Hunter Tract*, at 114-15; *Jackson v. Williams*, 714 P.2d 1017, 1022 (Okla. 1985).

Second, the *Hagemann* case is easily distinguishable from the current one. Most notably, the covenant in *Hagemann* specifically prohibited "business, industry or commercial enterprise of any kind or nature". *Hagemann*, at 87. Worthington's home is not subject to a business exclusion; her use need only be residential. As one court has pointed out, a "restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business uses." *Beverly Island*, 113 Mich. App. at 326. Moreover, the facts in *Hagemann* revealed a substantial commercial operation. There, the Worths ran a combination boarding home and adult foster care facility which cared for nine elderly adults in a specially designed octagonal structure containing a loft, 11 bedrooms and 6 bathrooms. *Hagemann*, at 87. In contrast, Worthington's adult family home is small, serves as the primary residence for all her family members, and maintains the neighborhood's residential appearance.

In the current case, the business aspects inherent in running an adult family home are clearly incidental to the primary purpose of the home: it provides a place where Worthington, her children, and the four adults reside. The monthly payments Worthington receives and the care she offers her adult family members do not negate the countless hours all in the home spend living together. *See, e.g., Blevins v. Barry-*

*Lawrence Cy. Ass'n for Retarded Citizens*, 707 S.W.2d 407 (Mo. 1986) (group home not a commercial enterprise); *Jackson v. Williams*, 714 P.2d 1017, 1022 (Okla. 1985) (incidental commercial characteristics did not negate residential nature of group home); *Rhodes v. Palmetto Pathway Homes, Inc.*, 303 S.C. 308, 400 S.E.2d 484 (1991) (incidental necessities of running a group home like maintaining records and providing care do not change the primary purpose from a residential one); *Metzner*, 69 Wn. App. at 411. If it did, anyone who pays rent or works at home would violate the "residential purposes only" covenant. Surely, such a result was never intended.

Furthermore, in seeking an injunction, the Homeowners failed to produce any evidence demonstrating that Worthington's supplemental use of her home to care for elderly adults contravened the covenant, or affected the neighborhood in any manner. Worthington largely runs the adult family home by herself. From the outside, her house does not differ in appearance from the other structures in the neighborhood. Although the residents require 24-hour care, the care is non-health related — the same type of care one would provide for a child or older relative. Although there is some suggestion that her household places additional strains on the subdivision's common water system, the same would be true for any large family. Similarly, there is no evidence demonstrating an increase in traffic beyond what a large family might engender. *See, e.g.*, *Metzner*, 69 Wn. App. at 411 (noise generated by day-care operation was same as large family).

Thus, I would find that Worthington's use of her property as an adult family home is consistent with the "residential purposes only" portion of the Mains Farm covenant. In doing so, I would reaffirm the reasoning announced 76 years ago in the *Hunter Tract* decision. The incidental aspects involved in operating a small, adult family home are not sufficient to override the residential character of the use. Unfortunately, the majority's decision to not follow the *Hunter Tract* reasoning will force Worthington's elderly residents out of the

Mains Farm subdivision, and severely limit the places where they might relocate.

JOHNSON, J., concurs with DURHAM, J.