166 P.3d 770 (2007)
SAVE SEA LAWN ACRES ASSOCIATION, a non-profit corporation, Appellant,
v.
James MERCER Jr. and Jane E. Powers, husband and wife; John B. and Pamela Joyce Harwood, husband and wife; Frank Douglas and Patricia Woods Schattauer, husband and wife; Charles Pollard and Lytitia Weed Parmenter, husband and wife; Judith M. and David Joseph Dellino, husband and wife; Jeanne J. Counts; Mary Jane Lillington; Scott and Lynn Vesey, husband and wife; David W. Goit; Julie M., Joanne and Caroline McCormick; Ernest W. and Charlotte L. Lauridsen, husband and wife; Thomas A. and Valerie R. Jacobson, husband and wife; Mark D. and Maria S. Nelson, husband and wife; Peter S. Margitan and Carol Zwiebel, husband and wife; Heather and David Miller, husband and wife; Carolyn Cushing Kruse; Dorothy M. Silkwood; Charles P.E. Leitch; Marlene Friend; Douglas J. and Sharon M. Howell, husband and wife; Dorothy H. and David E. Bronson, husband and wife; Evelyne J. Marwood; William E. and Pearl B. Mangold, husband and wife; Thomas E. Healy Jr.; Edward J. Wherland; William R. and Eva Mae Keeler Anderson, husband and wife; Randy Lee Nanstad; Joseph A. and Grace Ch Hensley, husband and wife; Jonathan A. Maas and Allison C. Hiltner, husband and wife; Joanna G. Veloras; Jonathan E. Park; Loui G. Veloras and Constantina M. Delhoras, husband and wife; Pamela M. Graber; Stephanie Jo McManusvon Lossow; Alexis Tristan; Kay M. Groves; Carole Olson; Billy D. Courter; Timothy T. Boyce; Willard F. and Teresa L. Noonan, husband and wife; Erik and Sandra E. Klepp, husband and wife; Stephen S. and Sandra L. Haanen, husband and wife; Donna A. Williams; Janice E. Palumbo; Julie Ann and Richard Holly; Alvin Julius Geiser and Elyse Joy Lituack; and Wilma C. Johnson, and John Does 1-30, Respondents.
No. 58941-5-I.
Court of Appeals of Washington, Division 1.
August 27, 2007.
*771 Stephen Tadashi Araki, Robert Brian Jackson, Attorney at Law, Bellevue, WA, Philip Albert Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Appellant.
Scott E. Feir, Montgomery Purdue Blankinship & Austin, Seattle, WA, for Respondents.
GROSSE, J.
¶ 1 Extrinsic evidence to interpret a covenant is limited to the interpretation of the covenant itself and may not be used to show an intention independent of the instrument. Thus, a sales brochure claiming an unobstructed view for lots in one plat does not aid in the interpretation of a covenant that burdens lots in a separate and distinct plat. Here, where the parties in one plat have revoked the restrictive covenant for that plat, the owners of lots in an adjacent but separate plat cannot enforce that restrictive covenant. We affirm.

FACTS
¶ 2 Sea Lawn Acres Investment Company separately platted adjacent subdivisions. The plat for "Sea Lawn Acres Division No. One" (Plat 1) was created by an instrument recorded April 11, 1951.[1] Plat 1 consists of 36 residential lots. The plat contains no reference to any other plat. In fact, the map section recorded for Plat 1 designated the area that would become Plat 2 as unplatted property.
¶ 3 Restrictive covenants for Plat 1 were executed on April 28, 1951, and recorded on May 10, 1951. The restrictive covenants provided in part:
The undersigned, Sea Lawn Acres Investment Company, . . . duly platted as Sea Lawn Acres Division No. One, according to the plat thereof recorded in Volume 48 of Plats, page 41, records of said county, do hereby establish the following restrictive covenants as a general plan for the development, improvement, maintenance and protection of all the lots included in said plat.

All of the foregoing conditions, limitations, restrictions and covenants shall be deemed covenants and restrictions running with the land and shall be binding on any and all persons who may at any time or *772 from time to time own or have any interest whatsoever in any lot in said plat, . . . until January 1, 1956, at which time said covenants and restrictions shall be automatically extended for successive periods of 10 years each unless on or before said above mentioned date or any ten year extension, a written instrument shall be executed by the then record owners of a majority of the lots in said plat and duly recorded in the office of the Auditor of King County, Washington, terminating or otherwise changing or modifying said covenants or restrictions in whole or in part, to take effect on said above mentioned date or at the expiration of any of successive ten year periods thereafter.

The owner of any lot in said plat shall have the right and power to enforce any or all of the conditions, limitations, restrictions and covenants contained herein against any person or persons violating or attempting to violate the same. . . . [[2]]
¶ 4 The plat for "Sea Lawn Acres Division No. Two" (Plat 2) was created by instrument recorded April 27, 1951.[3] Plat 2 consists of 66 residential lots. Elmer and Grace Moss purchased 64 percent of the lots in Plat 2.
¶ 5 The deeds issued to the initial purchasers of Plat 2 did not contain any reference to the Plat 1 covenants. Restrictive covenants for Plat 2 were executed on May 23, 1951, and recorded on May 25, 1951. Plat 2's restrictive covenants are identical to those in Plat 1 recited above.
¶ 6 At the time the properties were marketed for sale, a brochure advertised Plat 1 as providing an "unobstructed and sweeping view of Puget Sound and the Olympic mountains. The lower portion [Plat 2], comprising another 50 lots, offers a partial view." These representations may well have been true at the time. Now, however, a newer and separate development known as Blakely Court has been erected. Blakely Court obstructs many of the views that were enjoyed by the homes in Plat 2.
¶ 7 A majority of the owners in Plat 2 voted to revoke the restrictive covenants of their plat. The revocation was filed on September 1, 2005,[4] and became effective on January 1, 2006. Save Sea Lawn Acres Association (SSLAA) was formed in November of 2005 to contest the revocation of the restrictive covenants by the owners of Plat 2. SSLAA sued to enjoin the owners of Plat 2 from revoking the restrictive covenant in their plat. The Plat 2 owners moved to dismiss.
¶ 8 The trial court granted the Plat 2 owners motion for summary judgment dismissal. SSLAA appeals.

ANALYSIS
¶ 9 The question of whether a lot owner in one plat has the legal right to enforce restrictive covenants that have been revoked by lot owners in an adjacent but separate plat is one of first impression in Washington State. Other jurisdictions, however, have not permitted such enforcement where "a subdivision is developed in sections and each section is platted and recorded at different times, restrictive covenants for each particular section apply only to lots within that section."[5]
¶ 10 For example, in Reid v. Standard Oil Co.,[6] a developer purchased a tract of land with a suggested plat for the entire tract. That suggested plat was never recorded but had been followed with minor adjustments and displayed to the public at a sales office. The land was later surveyed and platted into three separate plats that were recorded separately. The deeds for the lots in the first plat contained restrictive covenants on commercial use and stated: "The following restrictions are applicable to and only to the *773 numbered lots shown in said plat."[7] A lot from the second plat, with a commercial use restriction, was subsequently sold. The covenant restricting commercial development was later canceled by a recorded agreement between the grantee and grantor for a lot in the second plat. That property was later sold to a developer for commercial use.
¶ 11 Two land owners from the first plat sued to enjoin the commercial use in the other plat, arguing that the lot in the second plat was originally encumbered by a covenant prohibiting commercial use and that, under the common plan rule, the parties had a right to rely upon the restrictions placed on other lots within the entire subdivision. The court held that the "in said plat" language in the first plat covenants restricted only the lots in the first plat.[8] The first plat lot owners had no obligations to land owners in other plats. Neither did the first plat lot owners have any right to insist on restrictions that may be enforceable between common purchasers in another plat. An unrecorded plat depicting the whole development did not contradict the court's finding.[9] The court noted that the lot owners of the first plat were on notice that the restrictions in their deeds were limited to the first plat and could neither sue to enforce restrictions in the second plat nor complain about the revocations of the restrictions that once encumbered the second plat. The general rule cited by the Reid court was
where the overall intent, as shown by plats, deed restrictions, and other like evidence, appears to be not to develop a subdivision as a single contemporaneous unit but to develop it progressively by sections, there is an explicit intent not to create a uniform system of reciprocal easements applicable to all sections but to develop a series of independent sections, each having its own restrictions benefiting only the lands in that section.[[10]]
¶ 12 Rooney v. Peoples Bank of Arapahoe County[11] is also instructive. There, multiple plats were created from a larger tract of land. The court refused to allow persons from another subdivision to enforce the restrictive covenants in the first:

The five subdivisions were developed as separate and distinct units. A separate plat was filed for each subdivision. The tract was not developed as a single contemporaneous unit. In similar factual situations, courts of other jurisdictions have held that where the grantor's entire tract of land is developed in separate sections and not as a single unit, there is no general plan or scheme which would permit owners in all the subdivisions to enforce restrictive covenants against each other.[[12]]
¶ 13 Like those in Reid and Rooney, the plats in Sea Lawn Acres were created and recorded at separate times. SSLAA argues that the fact that Plat 1 and Plat 2 were recorded within a month of each other demonstrates a common scheme or plan. In fact, the opposite is true. Plat 1 and Plat 2 had separate restrictive covenants. Each covenant reserved the right to enforcement and to revocation to only those lot owners who were within that plat. No deed to any lot in Plat 2 references the covenant in Plat 1 or vice versa. Both covenants identically recite that they may be terminated or revoked by a document "executed by the then record owners of a majority of the lots in said plat. . . ." The limiting phrase "in said plat" is legally significant and results in the covenants being "applicable to and only to the numbered lots shown [on the respective plat]."[13]
¶ 14 SSLAA argues that the revocation by Plat 2 lot owners was invalid because the owners of lots in Plat 1 did not participate in the revocation process. However, the Plat 2 covenants expressly limit revocation to a "written instrument . . . executed by the then *774 record owners of a majority of the lots in said plat." There is no reference to Plat 1, its covenants or the lot owners' rights therein.
¶ 15 Courts in other jurisdictions have refused to recognize the right of a lot owner in one plat to vote on the amendment or revocation of covenants in another plat. In Loving v. Clem,[14] a common grantor divided a tract of land and placed restrictive covenants in the deed for each lot. Although not identical, each covenant contained a provision allowing alteration of the restrictions pursuant to specified conditions. A group of lot owners amended their covenants pursuant to a provision allowing for amendment by three-fourths of the lot owners within a described area within the subdivision. A group of owners outside of the area specified in the covenants contested the amendment arguing they were not allowed to vote on said amendment.[15] In analyzing the language empowering lot owners to vote, the court determined that the clause giving the vote to "the owners of lots on said street" demonstrated an intent "that the common grantor created separate units and vested the owners of lots in each unit with power to amend the restrictive clauses without the aid or interference of owners of lots located in other units."[16]
¶ 16 SSLAA contends the sales brochure is critical because it demonstrates the grantor's intent to have a common scheme or plan for the entire development of Sea Lawn Acres. SSLAA argues the rules governing the interpretation of restrictive covenants require the court to construe the intent of the drafting party, defining its terms by their meaning at the time the language was drafted.[17] Under Berg v. Hudesman[18] and its progeny, "extrinsic evidence may be relevant in discerning that intent, where the evidence gives meaning to words used in the contract."[19] While the Berg context rule has been extended to apply to the interpretation of restrictive covenants, it has not been extended to apply where evidence would show an intention independent of an instrument. Because the evidence sought to be introduced here would modify the written instrument, Berg is not applicable. This position is supported by Hollis:
[A]dmissible extrinsic evidence does not include:
 Evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term;
 Evidence that would show an intention independent of the instrument; or
 Evidence that would vary, contradict or modify the written word.[[20]]
¶ 17 In Hollis, the court held that the meaning of the words "plat" and "subdivision" were not ambiguous and refused to rewrite the plat covenants to change that meaning.[21]
¶ 18 SSLAA relies on Judd v. Robinson,[22] a decision of the Colorado Supreme Court as support for the proposition that different platted lots in neighborhoods can enforce covenants. However, Judd is distinguishable on its facts. In Judd, the deeds all contained a clause prohibiting the establishment of a saloon "`that shall depreciate the value of the neighboring property for dwelling houses.'"[23] There are no such cross-references here. In fact the restrictive covenant is limited to each plat. Here, the separate filing of the plats is indicative of separate covenants. The owners in Plat 1 have the authority to *775 enforce the restrictive covenant within their own plat, they do not have a clear legal or equitable right to enforce the restrictions contained in Plat 2.
¶ 19 While the owners of Plat 1 have benefited for over 50 years from the height restrictions contained in Plat 2, such benefit cannot be construed to give the owners the right to control the revoked restrictive covenant. Other courts have also refused to recognize the right of a lot owner in one plat to vote on an amendment or revocation of covenants in another plat. In Scoville v. SpringPark Homeowner's Ass'n,[24] the homeowners association sought to prevent homeowners in the second subdivision from terminating the covenants binding their properties. Like SSLAA, the homeowners in the first subdivision argued that the common plan doctrine prevented the second addition homeowners from voting on the revocation without the consent of the lot owner members of the homeowners association. The Scoville court rejected this position holding that the second addition lot owners could exercise their reserved right to revoke real property covenant even if doing so "is inconsistent with the general plan or scheme."[25] The covenants in Scoville are similar to the covenants here. Like the second addition subdivision owners in Scoville, the Plat 2 owners validly terminated the restrictions in accordance with the terms of the covenants.
¶ 20 The SSLAA[26] would also have this court apply the Restatement (Third) of Property-Servitudes § 2.14(2)(b) cmt. i at 190-91:
The idea underlying the doctrine is that when a purchaser buys land subject to restrictions imposed to carry out a general plan of development, the purchaser is entitled to assume that all the land in the development is, or will be, similarly restricted to carry out the general plan. By selling land with restrictions designed to put into effect a general plan of development, the developer impliedly represents to the purchasers that the rest of the land included in the plan is, or will be, similarly restricted. That representation is enforced, on the grounds of estoppel, by imposing an implied reciprocal servitude on the developer's remaining land included in the plan.
Thus, SSLAA argues, the owners of Plat 2 are estopped from revoking the restrictions in their covenant favoring the owners of Plat 1. SSLAA contends that as a matter of equity, this court should impose an implied reciprocal servitude permitting Plat 1 owners to vote on any effort to revoke height restrictions/view preservations in Plat 2. SSLAA relies upon the equitable principles enunciated in Johnson v. Mt. Baker Park Presbyterian Church.[27] However, the facts in Johnson are distinctly different than those we have here. In Johnson, the court dealt with one plat and no restrictive covenants. Here, we have two distinct plats each with their own restrictive covenants.
¶ 21 Moreover, a reading of the comments to the restatement provision that SSLAA relies on shows that it would not apply in this case. For instance, comment e explains:
Even though justice may require implication of a reciprocal servitude burdening the developer's remaining land . . ., the implied servitude may not be enforceable against successors without notice. See § 7.14, Extinguishment of Servitude Benefits Under Recording Act.[[28]]
In an illustration to comment f, the restatement provides the following example:
5. In the absence of other evidence that the unrestricted lots were intended to be burdened by the restrictions, the conclusion would be justified that a general plan existed for the purpose of implying that all of the lots in the subdivision were intended beneficiaries of the restrictions expressly imposed on the 150 lots, but it would not be justified for the purpose of implying *776 reciprocal servitudes burdening the 50 lots whose deeds included no restrictions.[[29]]
And further, in discussing what land is included in the general plan, the restatement continues:
When a tract is developed in phases, with separate units or subdivisions, the imposition of servitudes in one phase should not give rise to the implication of reciprocal servitudes burdening the remaining units or subdivisions, unless the developer clearly represented to purchasers that the remaining units would be subject to the same restrictions as the earlier ones.[[30]]
Thus, such an implied-reciprocal-servitude doctrine applies only when the developer does not follow the practice of recording a declaration applicable to the entire subdivision or general-plan area. It is a doctrine that protects interests of purchasers who rely on continued effectiveness of a general plan before all lots are developed.[31]
¶ 22 Here, the plats were recorded before the lots were developed. Washington recording statutes are designed and intended to provide constructive notice to land possessors who have restrictions burdening their land.[32] Thus, where existing property is described, the recorded document gives notice only to matters within its chain of title. Here, the restrictive covenant recorded for Plat 2 is only applicable to lot owners in Plat 2. There is no notice given to those plat owners regarding any interest of the owners of lots in Plat 1, a separate and distinct plat.
¶ 23 We affirm the trial court's order granting summary judgment dismissing SSLAA's claims.
WE CONCUR: COX and DWYER, JJ.
NOTES
[1] Auditor's file number 4125917 (now identified as instrument number XXXXXXXXXXXXXXX).
[2] (Emphasis added.)
[3] Auditor's file number 4131008 (now identified as instrument number XXXXXXXXXXXXXXX).
[4] "Revocation of Restrictive Covenants." Recorded under King County Auditor's file number XXXXXXXXXXXXXX.
[5] Marengo Hills, Inc. v. Watson, 368 So.2d 856, 857-58 (Ala.1979).
[6] 107 Ga.App. 497, 130 S.E.2d 777 (1963).
[7] Reid, 130 S.E.2d at 779 (emphasis added).
[8] Reid, 130 S.E.2d at 779.
[9] Reid, 130 S.E.2d at 781-82.
[10] Reid, 130 S.E.2d at 782 (internal quotation marks omitted).
[11] 32 Colo.App. 178, 513 P.2d 1077 (1973).
[12] 513 P.2d at 1077 (emphasis added.)
[13] Reid, 130 S.E.2d at 779.
[14] 30 S.W.2d 590 (Tex.Civ.App.1930).
[15] Loving, 30 S.W.2d at 591-92.
[16] Loving, 30 S.W.2d at 592-93.
[17] Krein v. Smith, 60 Wash.App. 809, 811, 807 P.2d 906 (1991); Lenhoff v. Birch Bay Real Estate, Inc., 22 Wash.App. 70, 73, 587 P.2d 1087 (1978); Leighton v. Leonard, 22 Wash.App. 136, 141, 589 P.2d 279 (1978); Burton v. Douglas County, 65 Wash.2d 619, 621-22, 399 P.2d 68 (1965).
[18] 115 Wash.2d 657, 667, 801 P.2d 222 (1990).
[19] Hollis v. Garwall, Inc., 137 Wash.2d 683, 695, 974 P.2d 836 (1999).
[20] Hollis, 137 Wash.2d at 695, 974 P.2d 836 (alteration in original).
[21] Hollis, 137 Wash.2d at 697-99, 974 P.2d 836.
[22] 41 Colo. 222, 92 P. 724 (1907).
[23] Judd, 92 P. at 726.
[24] 784 S.W.2d 498 (Tex.App.1990).
[25] Scoville, 784 S.W.2d at 504.
[26] The court did not consider the argument submitted with SSLAA's first additional authorities. RAP 10.8.
[27] 113 Wash. 458, 194 P. 536 (1920).
[28] RESTATEMENT (THIRD) OF PROPERTY-SERVITUDES § 2.14(2)(b) cmt. e at 184.
[29] RESTATEMENT (THIRD) OF PROPERTY-SERVITUDES § 2.14(2)(b) cmt. f at 186.
[30] RESTATEMENT (THIRD) OF PROPERTY-SERVITUDES § 2.14(2)(b) cmt. g at 187.
[31] RESTATEMENT (THIRD) OF PROPERTY-SERVITUDES § 2.14(2)(b).
[32] Dickson v. Kates, 132 Wash.App. 724, 737, 133 P.3d 498 (2006).