IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| MARK C. LEWINGTON, a Washington resident; NOEL P. SHILLITO and LAURIE A. SHILLITO, husband and wife and Washington residents; DANIEL P. OSTLUND and MARIE F. OSTLUND, husband and wife and Washington residents; and ELIZABETH T. WIGHT, a Washington resident, | No. 47022-5-II |
| Respondents, | |
| v. | UNPUBLISHED OPINION |
| FRANK I. PARSONS and NANCY A. PARSONS, husband and wife, and Washington residents, | |
| Appellants. | |

BJORGEN, C.J. — Frank and Nancy Parsons (the Parsons) appeal the trial court's order granting summary judgment to Mark Lewington, Noel and Laurie Shillito, Daniel and Marie Ostlund, and Elizabeth Wight (the Neighbors).

The parties all live in the Narrowmoor Third Addition in Tacoma, which has a set of restrictive covenants that apply to all residents living there. Covenant A prohibits homes from exceeding "two stories in height." Clerk's Papers (CP) at 17. The Parsons constructed an

additional story on top of their one-story home with a daylight basement, contending that the daylight basement does not constitute a story under Covenant A. The Neighbors disagreed and brought suit. The trial court granted summary judgment to the Neighbors, ruling that the language of Covenant A was unambiguous and a daylight basement counted as a story; that the Parsons' equitable defenses of collateral estoppel, acquiescence, and abandonment failed as a matter of law; and that the Parsons were enjoined from constructing an additional story over their home.

On two threshold matters, we hold that (1) the trial court erred in failing to dismiss the Shillitos from this lawsuit for lack of standing and (2) the trial court did not err in granting summary judgment in favor of the Neighbors on the issue of collateral estoppel.

However, we also hold that (3) the trial court erred in finding that the language of Covenant A was unambiguous and that a daylight basement constitutes a story. Because the Parsons submitted uncontroverted evidence that their daylight basement does not constitute a story under applicable contemporaneous law, we hold that their two-story home with a daylight basement does not violate Covenant A, and we reverse the trial court's ruling to the contrary. Because the Parsons' home does not violate Covenant A, we do not reach the trial court's grant of summary judgment in favor of the Neighbors on the issues of abandonment and acquiescence and we vacate the trial court's injunction against the Parsons' construction.

Accordingly, we affirm that part of the trial court's order granting summary judgment in favor of the Neighbors on the issue of collateral estoppel, and we reverse that part of the trial court's order granting summary judgment in favor of the Neighbors on the issue of whether the daylight basement constitutes a story.

2

No. 47022-5-II

FACTS

I. HISTORICAL AND PROCEDURAL BACKGROUND

1.      Creation of Narrowmoor Third Addition

Beginning in 1944, Eivind Anderson[1] began the platting and creation of the Narrowmoor

communities.  In total, there are four Narrowmoor additions with the final one platted in 1954.

Each Narrowmoor addition has its own set of governing restrictive covenants, but all are largely

similar.  At issue in this case is Covenant A from the Narrowmoor Third Addition, which reads:

> Except as otherwise herein specifically stated, no structure shall be erected, place[d]
> or permitted to remain on any residential building plat other than one detached
> single family dwelling *not to exceed two stories in height*, and a private garage.

CP at 236 (emphasis added).

2.      Prior Lawsuit: *Lester v. Willardsen*

Spencer M. and Ann Willardsen owned a one-story home with a daylight basement

located on the uphill portion of the Narrowmoor Third Addition.  With approval from the city of

Tacoma, they decided to build another story on top of their home.  In 1985, homeowners located

in the Narrowmoor Third Addition filed a lawsuit against the Willardsens for violation of

Covenant A, which continued as a class action lawsuit (the *Lester* Class).[2]  Notice of the class

action was given to all the Narrowmoor Third homeowners and allowed each homeowner to opt

out.

---

[1] There were other drafters involved in this process, but we only refer to Anderson for ease of reading this opinion.

[2] The lawsuit also involved allegations against the city of Tacoma for violating the homeowners' due process and equal protection rights.

After a bench trial, the trial court entered an order with findings of fact and conclusions of law, requiring the Willardsens to remove the third story from their home.[3] On appeal, this court in *Lester v. Willardsen*[4] reversed the trial court's decision, holding that the Willardsens' home did not constitute "a conventional two-story house." CP at 351. The *Lester* court reasoned that Covenant A's language was ambiguous and that the *Lester* Class failed to meet their burden of showing that a more restrictive interpretation was intended. Without the requisite evidence, the *Lester* court employed the general interpretative rule that doubts in the meaning of a covenant must be resolved in favor of the free use of land and held that there was no support in the record to find the intention that a daylight basement constitutes a story. After the Washington Supreme Court denied review,[5] the trial court entered judgment in favor of the Willardsens.

## II. THE CURRENT LAWSUIT

In March 2014, the Parsons purchased a home in the Narrowmoor Third Addition. At the time, the home had a daylight basement plus one story. The Parsons decided to build a second story on top of the home; all-in-all, the construction of the second story is 4.62 feet above the

---

[3] The trial court specifically stated in finding 10 that it did not need to find the lowest floor to the Willardsen home as a "[s]tory" or "[b]asement." CP at 427. Rather, because the Willardsens had conceded that the upper two floors constituted stories and that the daylight basement "contribute[d] to the height]," this "cause[d] the residence to be in excess of two stories" in height contrary to Covenant A. *Id.*

[4] *Lester v. Willardsen*, 58 Wn. App. 1068, 1990 WL 318860 (Aug. 1990) (unpublished opinion).

[5] *Lester v. Willardsen*, 116 Wn.2d 1004, 803 P.2d 1309 (1991).

height of their old roof. The Parsons assert that in the months before construction began they were "up front about [their] plans to renovate [their] home" with the Neighbors. CP at 231. However, the Neighbors dispute how "upfront" the Parsons were, suggesting that the Parsons only told them that they were adding a garage or that any addition would only make "the roof . . . go up a little bit in the middle." CP at 406.

On July 22, 2014, construction of the additional story commenced. On August 4 the Parsons sent a letter to the Ostlunds, assuring that they would comply "absolutely" with the Narrowmoor Third Addition covenants. CP at 413. Shortly thereafter, the Neighbors saw an "enormous roof ridge beam" delivered to the construction site of the Parsons' home, CP at 406, which prompted Lewington to send a letter to the Parsons. The letter dated August 13 stated that the Neighbors believed the Parsons might be violating Covenant A and that they should meet to discuss how the Parsons might revise their construction plans to minimize view impacts and comply with Covenant A. The Parsons did not meet with the Neighbors. They also did not stop construction, because to do so would have required them to incur great expense.

On August 22, 2014, the Neighbors filed a complaint against the Parsons. On November 14, the Neighbors moved for summary judgment as to the meaning of Covenant A. On December 12, the trial court heard argument from both parties and granted summary judgment in favor of the Neighbors, ruling that Covenant A is unambiguous: a daylight basement is a story. The trial court also implicitly ruled that the Parsons' defenses of collateral estoppel, acquiescence, and abandonment failed as a matter of law. Finally, the trial court ordered that the

5

No. 47022-5-II

Parsons were enjoined "from constructing a three-story addition, with two upper stories over a daylight basement story." CP at 557.

The Parsons appeal.

ANALYSIS

I. STANDARD OF REVIEW

"We review de novo a trial court's decision to grant summary judgment, engaging in the same inquiry as the trial court." *Old City Hall LLC v. Pierce County AIDS Found.*, 181 Wn. App. 1, 8, 329 P.3d 83 (2014). "We affirm a grant of summary judgment where no material issue of fact exists and the moving party is entitled to judgment as a matter of law." *Id.*; CR 56(c). We "view all facts and any reasonable inferences drawn from those facts in the light most favorable to the nonmoving party." *Id.*

II. SHILLITOS' STANDING

The Parsons first argue that the Shillitos must be dismissed from this suit for their lack of standing. We agree. The Shillitos are located in Narrowmoor Second Addition, but their property "abuts" Narrowmoor Third. Br. of Resp't at 10. The Narrowmoor Third Addition platting document specifically allows any person "owning any real property *in said subdivision* to prosecute any proceedings" against other Narrowmoor Third homeowners that violate the covenants. CP at 236 (emphasis added). This language demonstrates the drafter's intent to only allow those real property owners in Narrowmoor Third Addition to enforce the covenants. *Save Sea Lawn Acres Ass'n v. Mercer*, 140 Wn. App. 411, 417, 166 P.3d 770 (2007); *Mack v. Armstrong*, 147 Wn. App. 522, 527-28, 195 P.3d 1027 (2008). There is no evidence suggesting

6

that the inhabitants of Narrowmoor Second have any enforcement right for the restrictive covenants of Narrowmoor Third. *See Save Sea Lawn*, 140 Wn. App. at 422.

The Neighbors argue that it was "unnecessary for the Superior Court to reach the question of the Shillitos' standing since all of the other Plaintiffs live in Narrowmoor Third." Br. of Resp't at 44-45. We disagree. Restrictive covenants can only be enforced if the plaintiff has "a justiciable interest in enforcement, generally an ownership interest in the benefited property." *Lakewood Racquet Club, Inc. v. Jensen*, 156 Wn. App. 215, 228, 232 P.3d 1147 (2010). The Shillitos did not have a property interest or legal right to enforce the restrictive covenants in Narrowmoor Third Addition. Accordingly, we reverse the trial court's determination[6] that the Shillitos had standing to bring this lawsuit. We express no opinion on sources of standing apart from the enforcement of the Narrowmoor Third covenants.

### III. COLLATERAL ESTOPPEL

Next, the Parsons argue that the trial court erred in granting summary judgment in favor of the Neighbors on Parsons' defense of collateral estoppel. We disagree. We affirm the trial court and hold that Lewington, Wight, and the Ostlunds are not collaterally estopped by the *Lester* decision, because with a significant change in the law of restrictive covenants, collateral estoppel would work an injustice against them. Accordingly, the Neighbors were not barred from bringing this suit.

---

[6] Even though the trial court did not directly address this issue, the Parsons raised it in their summary judgment motion. Thus, the trial court's failure to address the issue must be taken as an implicit denial of the Parsons' challenge to the Shillitos' standing.

Collateral estoppel or issue preclusion bars relitigation of the same issue in a subsequent action when that issue has actually been litigated as well as necessarily and finally determined in the earlier proceeding. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 306-07, 96 P.3d 957 (2004). The purpose of collateral estoppel is to promote judicial economy by avoiding relitigation of the same issue, to afford the parties the assurance of finality of judicial determinations, and to prevent harassment of and inconvenience to litigants. *Id*. The inquiry focuses on whether "the party against whom the doctrine is asserted . . . had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id*. at 307; *State Farm Mut. Auto. Ins. Co. v. Avery*, 114 Wn. App. 299, 304, 57 P.3d 300 (2002). Accordingly, the party seeking the doctrine's application bears the burden of showing that

> "(1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding; (2) the earlier proceeding ended in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding; and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied."

*Regan v. McLachlan*, 163 Wn. App. 171, 181, 257 P.3d 1122 (2011) (quoting *Christensen*, 152 Wn.2d at 307).

Here, as the Neighbors point out, the law of restrictive covenants has changed in a way that would make preclusion of their lawsuit unjust. Under current law, we place special emphasis on arriving at an interpretation of restrictive covenants that protects the homeowners' collective interests, rather than favoring the free use of land. *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 250, 327 P.3d 614 (2014); *Riss v. Angel*, 131 Wn.2d 612, 621-24, 934

8

P.2d 669 (1997). In contrast to the current rule, the *Lester* court reversed the trial court, applying the old rule that doubts must be resolved in favor of the free use of land. While the availability of different remedies has been found not to work an injustice, *Christensen*, 152 Wn.2d at 317-18, a difference in the burden of proof has. *Beckett v. Dep't of Soc. & Health Servs.*, 87 Wn.2d 184, 188, 550 P.2d 529 (1976), *overruled on other grounds recognized by Thompson v. State, Dep't of Licensing*, 138 Wn.2d 783, 796, 982 P.2d 601 (1999). This modification in restrictive covenant law shifts our interpretative presumption and functions similarly to a change in the burden of proof. *Beckett*, 87 Wn.2d at 188.

In their argument, the Parsons remind us that "[t]he injustice component is generally concerned with procedural, not substantive irregularity." *Christensen*, 152 Wn.2d at 309. They argue that because the *Lester* Class "prosecuted a multi-day trial in Pierce County Superior Court, defended the trial court's findings and conclusions on appeal, and then pursued relief from the Washington Supreme Court," the prior litigation is procedurally just. Br. of Appellant at 34; Reply Br. of Appellant at 6-7. However, the drastic change in the law of restrictive covenants outweighs the interest of treating the prior litigation with finality. In *State Farm Fire & Casualty Co. v. Ford Motor Co.*, Division One of our court held that collateral estoppel would work an injustice against the defendant when it otherwise would be "'afforded procedural opportunities in the later action that were unavailable in the first and that could readily cause a different result.'" 186 Wn. App. 715, 725, 346 P.3d 771 (2015) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 58 L. ed. 2d 552 (1979)), *remanded*, 2015 WL 9948132 (Dec.

2015). Similarly to *State Farm*, allowing collateral estoppel to supplant the current rule of interpretation with the repudiated former rule could readily cause a different result and work an injustice. Accordingly, we affirm the trial court's granting of summary judgment in favor of the Neighbors and hold that they are not collaterally estopped by the prior litigation.[7]

## IV. MEANING OF COVENANT A

Next, the Parsons argue that the trial court erred in granting summary judgment to the Neighbors and ruling that Covenant A's meaning is unambiguous. We agree. The plain language and the context of the instrument does not illuminate the definition of "two stories in height," thus rendering the term ambiguous in this setting. However, we also hold that extrinsic evidence in the contemporaneous 1939 Building Code supplies the proper definition of "story" to reflect the drafter's intent in creating Covenant A. The Parsons submitted uncontroverted evidence that their daylight basement would not count as a "story" under the 1939 Building Code. Therefore, the Parsons' two-story home with a daylight basement does not violate Covenant A.

1. Legal Principles

Interpretation of a restrictive covenant is a question of law. *Wilkinson*, 180 Wn.2d at 249. The primary objective in interpreting a restrictive covenant is to determine the drafter's intent or purpose. *Id.* at 250; *Riss*, 131 Wn.2d at 621; *Bloome v. Haverly*, 154 Wn. App. 129, 138, 225 P.3d 330 (2010). Generally, ascertaining the drafter's intent or purpose behind a

---

[7] Because we hold that an injustice against the Neighbors would result if we applied collateral estoppel, we do not address the first two elements of the doctrine. As to the third element, we recognize that the Ostlunds and Wight would not be collaterally estopped because they or their predecessors-in-interest opted out from the *Lester* Class, removing their privity with that class.

restrictive covenant is a question of fact, "'[b]ut where reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law.'" *Wilkinson*, 180 Wn.2d at 250 (quoting *Ross v. Bennett*, 148 Wn. App. 40, 49-50, 203 P.3d 383 (2009)).

In determining the drafter's intent or purpose in crafting restrictive covenants, we observe the "'ordinary and common use'" of the language and "will not construe a term in such a way 'so as to defeat the plain and obvious meaning.'" *Id.* (quoting *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 816, 854 P.2d 1072 (1993)). We also examine the instrument as a whole in determining the meaning of a restrictive covenant's language. *Id.* The lack of an express term with the inclusion of other similar terms is evidence of the drafter's intent. *Id.* at 251. Extrinsic evidence can be "used to illuminate what was written," but it cannot be used to "show an intention independent of the instrument," "vary, contradict or modify the written word," or demonstrate a "party's unilateral or subjective intent as to the meaning of a contract word or term." *Hollis v. Garwall, Inc.*, 137 Wn. 2d 683, 695, 697, 974 P.2d 836 (1999).

As discussed above in our analysis of collateral estoppel, we place special emphasis on arriving at an interpretation of the restrictive covenants that protects the homeowners' collective interests, rather than that which favors the free use of land. *Wilkinson*, 180 Wn.2d at 250; *Riss*, 131 Wn.2d at 623-24. The Washington Supreme Court has made clear that "[w]hile Washington courts once strictly construed covenants in favor of the free use of land, we no longer apply this rule where the dispute is between homeowners who are jointly governed by the covenants." *Wilkinson*, 180 Wn.2d at 249-50 (citing *Riss*, 131 Wn.2d at 621-624). This rule rests on the recognition that "'[s]ubdivision covenants tend to enhance, not inhibit, the efficient use of land.'" *Id.* (quoting *Mains Farm*, 121 Wn.2d at 816).

11

2.        The Ordinary Meaning of the Phrase "two stories in height"

The parties dispute the meaning of Covenant A, which reads:

Except as otherwise herein specifically stated, no structure shall be erected, place[d] or permitted to remain on any residential building plat other than one detached single family dwelling *not to exceed two stories in height*, and a private garage.

CP at 236 (emphasis added).  However, neither the plain and ordinary meaning of Covenant A nor Covenant D, which restricts tall trees from being grown in Narrowmoor Third for view protection, demonstrates whether a daylight basement is a "story" as a matter of law.

a.  Plain and Ordinary Meaning

The Parsons argue that Anderson added the term "in height" with the intention that subterranean levels, such as daylight basements, are not counted as stories "in height."  Br. of Appellant at 22.  The Neighbors contend that "'in height' is simply another way of saying not to exceed two stories high."  Br. of Resp't at 23.  Even after giving the words "story" and "in height" their plain and ordinary meaning, we hold that Anderson's intent remains ambiguous as to whether a daylight basement counts as a "story."

The inability to discern the plain and ordinary meaning of "story" and "in height" is illuminated by the pertinent dictionary definitions.  According to *Webster's Third New International Dictionary*, "story," in part, means "a set of rooms on one floor level of a building excluding the attic level and usu[ally] the cellar or basement level."[8]  WEBSTER'S THIRD NEW INT'L DICTIONARY at 2253 (2002).  Although basement levels are not "usually" counted as a

_____

[8] The second definition of "story" is "one of a series of tiers arranged horizontally one over another."  WEBSTER'S, *supra*, at 2253.

12

story under this definition, the probability that basements in the abstract are excluded does not

dispel the fog around whether Anderson intended daylight basements to counts as s story.

*Webster's* defines "height" as "the extent of elevation above a level: . . . distance

extending upwards."[9] WEBSTER'S, *supra*, at 1050. Under this definition, a "story" inherently has

height whether underground, partially underground, or above ground. Contrary to the Parsons'

argument, these definitions do not necessarily exclude daylight basements from the reach of

Covenant A. Accordingly, we cannot decipher the drafter's intent in crafting Covenant A by

only looking at the plain and ordinary meaning of the words.

b. Covenant D

Next, the Neighbors cite Covenant D from the Narrowmoor Third covenants to support

their contention that the drafter intended to protect the homeowners' views. Covenant D reads:

> No tall growing trees, such as Southern Poplar, Maple or any other similar species
> that would obstruct the panoramic view of the sound shall be planted or permitted
> to grow west of Fairview Drive, nor shall any commercial billboard be so located.

CP at 236. The Parsons contend that Covenant D is "notably different" from Covenant A

because Covenant A makes no reference to views and does not exclude any properties from its

restrictions, since all properties within Narrowmoor Third are subject to the "two stories in

height" restriction. Br. of Appellant at 23-24.

We agree that it matters that Anderson specified the purpose of Covenant D, whereas

with Covenant A he simply stated that homes should be "two stories in height" without

expressing any underlying purpose. Contrary to the Neighbors' assertion, Covenant D's purpose

---

[9] The second definition of "height" is "the distance extending from the bottom to the top of something standing upright . . . or from the bottom to an arbitrarily chosen upper point." WEBSTER'S, *supra*, at 1050.

in protecting views does not necessarily translate to Anderson's purpose behind limiting homes to two stories in height. It is just as reasonable to believe that Anderson created the two story limitation because of a desire to create uniformity between the homes in Narrowmoor Third.[10] Anderson could have intended that homes were allowed to be larger because the additional space produces more utility at the sacrifice of a partial view of the Puget Sound; whereas, with tall trees, their utility does not outweigh the views they may obstruct in the same way. It is also possible that Anderson intended Covenant A both to protect views and to create uniformity between Narrowmoor Third residences. Because it is unclear, we hold that Covenant D does not show as a matter of law what Anderson intended in Covenant A.

3.      Extrinsic Evidence: 1939 Building Code and 1945 Zoning Ordinance

Because the language and context of the instrument do not make clear Anderson's intent in drafting Covenant A, we next turn to extrinsic evidence to reveal that intent. The main extrinsic evidence includes the 1939 Building Code and 1945 Zoning Ordinance, which neither party disputes were in effect at the time Anderson drafted Covenant A. We hold that the extrinsic evidence from the 1939 Building Code supplies the appropriate definition of "story" in Covenant A as a matter of law.

The Parsons argue that the definition of "story" from the 1939 Building Code should inform our understanding of Anderson's intent:

---

[10] Covenant E also supports the theory that Anderson's purpose in creating Covenant A was for uniformity and consistency in the neighborhood. Covenant E sets a minimum for the square footage each dwelling is required to have depending on the block and lot on which the dwelling is located.

> **Story** means that portion of a building included between the upper surface of any floor and the upper surface of the floor next above, except that the topmost story shall be that potion of a building included between the upper surface of the topmost floor and the ceiling or roof above. If the finished floor level directly above a basement or cellar is more than six feet (6') above grade such basement or cellar shall be considered a story.

CP at 291. The Neighbors argue instead that we should rely on the definition of "story" from the 1945 Zoning Ordinance. That provision defines "story" similarly to the 1939 Building Code, except without a method to determine whether a basement or cellar is considered a story:

> Story: [t]hat portion of a building included between the surface of any floor and the surface of the floor next above it, or if there be no floor above it, then the space between such floor and the ceiling next above it.

CP at 89. Based on the 1945 Zoning Ordinance's definition of "story," the Neighbors contend that "story encompassed any space, above any floor" and, therefore, a daylight basement was a story. Br. of Resp't at 25 (emphasis omitted).

We presume a drafter crafts restrictive covenants consistently with relevant laws that were in existence at the time, unless the covenants indicate a contrary intent. *See Reynolds v. Ins. Co. of N. Am.*, 23 Wn. App. 286, 290-91, 592 P.2d 1121 (1979); *accord Fischler v. Nicklin*, 51 Wn.2d 518, 522, 319 P.2d 1098 (1958); *Wagner v. Wagner*, 95 Wn.2d 94, 98, 621 P.2d 1279 (1980); *In re Kane*, 181 Wash. 407, 410, 43 P.2d 619 (1935). Accordingly, the issue here is whether the 1939 Building Code or 1945 Zoning Ordinance is the more closely applicable law in supplying the definition of "story" in Covenant A. Under the facts presented here, we hold that the 1939 Building Code is the closer fit.

Both the 1939 Building Code and 1945 Zoning Ordinance define terms for the purposes

of each code. A restrictive covenant, of course, is not a provision of either a zoning or building code. Instead, restrictive covenants are private agreements restricting the use of land, largely as a matter of property common law. Building and zoning codes are each exercises of the police power, the power of government to regulate in the public interest. That regulatory purpose animates each of the codes at issue. For example, chapter 1, section 102 of the 1939 Building Code states:

> The purpose of this Code is to provide certain minimum standards, provisions and requirements for safe and stable design, methods of construction and uses of materials in buildings and/or structures hereafter erected, constructed, enlarged, altered, repaired, moved, converted to other uses or demolished and to regulate the equipment, maintenance, use and occupancy of all buildings and/or structures in the City of Tacoma.

CP at 289. Similarly, the Preamble to 1945 Zoning Ordinance states:

> An ordinance to regulate the location and use of buildings and the use of land within the City of Tacoma; to limit the height of buildings; to prescribe building lines and the size of yards and other open spaces and for these purposes to divide the city into districts.

CP at 88.

A zoning ordinance typically regulates the use of land and the location and use of buildings, including their height. As part of that purpose, the 1945 Zoning Ordinance defines "story." On the other hand, a building code determines how one safely and stably constructs a building within the parameters of law, and as part of that purpose the 1939 Building Code also defines "story." The zoning ordinance defines "story" as part of its regulation of the use of land,

16

which applies independently of any private covenants. The building code defines "story" as part of its prescription of how structures are built, a purpose more closely related to the work of Covenant A, limiting how many stories a building may have. In addition, the height limitations of the zoning ordinance are merely a reference to those of the building code, suggesting even more strongly that the terms of the latter apply in this situation, including its definition of story. Accordingly, we hold that the 1939 Building Code supplies the appropriate definition of "story" in Covenant A.[11]

4.      The Parsons' Daylight Basement

Because the 1939 Building Code supplies the definition for story in Covenant A, we examine next whether the Parsons' daylight basement constitutes a "story" under that definition. We hold that it does not. The Parsons submitted uncontroverted evidence demonstrating that their daylight basement does not fall within the confines of the 1939 Building Code's definition of "story."

---

[11] The Neighbors also point to the development of Narrowmoor Fourth Addition as extrinsic evidence illuminating Anderson's intent to count a daylight basement as a story. They argue that the change in phrasing from "two stories in height" in Covenant A to "not to exceed one story in height, exclusive of basement story" in the Narrowmoor Fourth Addition covenant was concurrent with a change in the 1953 Zoning Ordinance, which added definitions of "basement" and "cellar," and "implied that such spaces would no longer be counted as stories if more than half of the space was underground." CP at 442-44; Br. of Resp't at 26.

    Although it is certainly possible that Anderson changed the covenant language in Narrowmoor Fourth in light of the 1953 Zoning Ordinance, this evidence has little, if any, relation to Anderson's intent in drafting Covenant A, completed nine years previously. It could be coincidental; it could be because he wanted the homes to be different in Narrowmoor Fourth Addition and Narrowmoor Third Addition; it could be because he wanted a daylight basement to be considered a story in all of the Narrowmoor communities; whatever the case, Anderson's intent in drafting Covenant A cannot be derived from this extrinsic evidence.

No. 47022-5-II

As set out above, the definition of "story" in the 1939 Building Code states that

[i]f the finished floor level directly above a basement or cellar is more than six feet (6') above grade such basement or cellar shall be considered a story.

CP at 291. The 1939 Building Code defines "Grade (Ground Level)" as:

1. For buildings adjoining one street only, the elevation of the sidewalk at the center of the wall adjoining the street.
2. For buildings adjoining more than one street, the average of the elevations of the sidewalk at centers of all walls adjoining streets.
3. For buildings having no wall adjoining the street the average level of the ground (finished surface) adjacent to the exterior walls of the building. All walls approximately parallel to and not more than five feet (5') from a street line are to be considered as adjoining a street.

CP at 290.

The only evidence as to whether the Parsons' daylight basement meets this 1939 definition of "story" is the declaration of professional land surveyor Thomas R. Gold. In analyzing this question, Gold used the third alternative definition of "grade" immediately above, without any controverting evidence from the Neighbors. CP at 367-68. Using this definition, Gold calculated the average grade of the Parsons' home after the renovation. He then determined that the elevation of the finished floor level of the first floor is less than six feet above the average grade calculated consistently with the 1939 Building Code. Because that floor level must be more than six feet above grade to qualify as a story, Gold concluded that the Parsons' daylight basement is not a "story" under the 1939 Building Code.

Therefore, in the absence of any genuine issue of material fact, the Parsons' basement as a matter of law is not a story under the 1939 Building Code and consequently does not count as a

18

story under Covenant A. Consistently with CR 56(c), we reverse the trial court's grant of summary judgment in favor of the Neighbors.

## V. ACQUIESCENCE, ABANDONMENT, AND INJUNCTIVE RELIEF

The Parsons argue that the trial court erred in granting summary judgment to the Neighbors on the defenses of acquiescence and abandonment and in enjoining the Parsons from constructing two stories over a daylight basement. Because we hold that the Parsons' daylight basement is not a story as defined in Covenant A, we need not reach the issues of acquiescence or abandonment. For the same reason, injunctive relief is no longer proper, and we vacate the injunction against the Parsons' construction.

## VI. COSTS

The Neighbors also asked for an award of costs under RCW 7.28.100. RCW 7.28.100 states "[t]hat the provisions of RCW 7.28.050 through 7.28.100 shall be liberally construed for the purposes set forth in those sections." This is not a cost awarding provision. The Neighbors provide no other argument for costs except the mere citation to RCW 7.28.100 in the conclusion of their response brief. Accordingly, we deny the request for costs.

## CONCLUSION

First, we dismiss the Shillitos from this lawsuit for lack of standing to enforce Covenant A. Second, we hold that the Neighbors were not collaterally estopped from bringing this suit against the Parsons, and we affirm the trial court's order granting summary judgment in favor of the Neighbors on collateral estoppel. Third, we hold that the 1939 Building Code's definitions are proper extrinsic evidence to illuminate Anderson's intent in drafting Covenant A and that the Parsons submitted uncontroverted evidence showing that their daylight basement is not a story

under those definitions. Therefore, we hold that the Parsons' daylight basement is not a story under Covenant A, and we reverse the trial's court's order granting summary judgment in favor of the Neighbors on that issue. We do not reach the trial court's order granting summary judgment in favor of the Neighbors on the issues of abandonment and acquiescence, and we vacate the injunction issued by the trial court against the Parsons' construction.

Affirmed in part and reversed in part.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
BJORGEN, J.

We concur:

_____
MELNICK, J.

_____
SUTTON, J.